356 A.2d 335 (1976)
In the Matter of C. A. P.
No. 9365.
District of Columbia Court of Appeals.
Submitted July 17, 1975.
Decided April 13, 1976.
Wesley S. Williams, Washington, D.C., Herbert B. Dixon, Jr., and William & Carter, Washington, D.C., were on the brief for appellant mother.
*336 Jean R. Bower and Anne T. Liipfert, Washington, D.C., were on the brief for C. A.P.
Louis P. Robbins, Principal Asst. Corp. Counsel, Washington, D.C. at the time the memorandum was filed, and Richard W. Barton and Dennis McDaniel, Asst. Corp. Counsel, Washington, D.C., were on the amicus curiae memorandum of the District of Columbia.
Before REILLY, Chief Judge, and KELLY and KERN, Associate Judges.
KELLY, Associate Judge:
In this appeal from the Family Division of the trial court the unmarried mother of C.A.P., a minor, challenges an order which terminates her parental rights pursuant to the provisions of Super.Ct.Neg.R. 18(c).[1] For the reasons which follow, we reverse.
Three days after C.A.P.'s birth in May 1970, the mother placed her with the Department of Human Resources (DHR), ostensibly for adoption. Legal consent to adoption was never given,[2] however, and she remained with the DHR with her legal status uncertain until October 1971, when the DHR filed a petition in Superior Court alleging that the child was neglected.[3] After the mother admitted the allegations of neglect, the court entered a dispositional order placing legal custody of C.A.P. with the Social Rehabilitation Administration (SRA) of the DHR.[4] The child remained in foster care thereafter and in November 1973, the DHR's ex parte motion to extend the dispositional order for an additional year was granted.[5] A review hearing was set for March 7, 1974.
There was a brief hearing on March 7, at which the mother was represented by a court-appointed attorney who had been assigned *337 immediately before the hearing and the child was represented by a third year law student.[6] An SRA caseworker informed the court that the mother had not cared for the child since birth; that the child had been under constant foster care; and the SRA was in need of a ruling on whether to return the child to her mother or to place her for adoption. The mother responded that her failure to care for the child was for financial reasons and while she wanted the child back, she could not take her then because her landlord did not allow children. Counsel for the child suggested that the mother be given a few months to find a place to live where she could take her daughter. The court accepted this proposed solution and, noting that the mother had permitted the District to raise her child for four years, instructed her that she had ninety days to find living quarters which allowed children and to arrange day care for the child while she worked.[7] If she failed to do so, she would have to consent to adoption or have her parental rights terminated at the next hearing which was set for June 7.
On May 27, 1974, the DHR formally petitioned the court to terminate the mother's parental rights, alleging that the mother, although financially able to do so, had not cared for the child since birth; that the father was married and living in Pennsylvania and unable to provide financial support; and that the mother during the past four years, and in particular since the March hearing, had not made any plans to assume responsibility for the child. The petition was supported by an affidavit from the same social worker who appeared at the March hearing. In addition to repeating the child's history, the social worker also stated that the mother visited the child once a month and called her twice a month. The social worker nevertheless concluded that "the Respondent is a healthy, happy, engaging child and an excellent candidate for adoption, I recommend, in the best interests of the child, that parental rights be terminated so that she can be adopted into a loving family."
At the June hearing, with the termination petition before him, the trial judge questioned the mother about the arrangements she had made to care for the child. The mother admitted that no definite plans had been made, although she did mention a vague commitment from a friend to care for the child while she worked. She objected to the termination, reiterated her desire to regain custody of her child, and protested that she had attempted to comply with the court's instructions but had been unable to do so in the time allowed her. Finally, the court was told that the mother had moved but had refused to give her new address to the social workers. The trial judge thereupon terminated the mother's parental rights, emphasizing the facts that for four years the mother had not cared for the child despite a financial ability to do so, and that she had refused to cooperate with the social workers assigned to her case.[8]
Undeterred by the court's ruling, the mother continued her efforts to obtain custody of her child. She eventually secured new counsel who filed a motion to set aside the order of termination of parental rights. The mother stated in the motion that she had not fully understood the implications of the previous court proceedings; that she now had suitable living quarters and day care for the child; and that she had not been advised that the termination *338 order was appealable.[9] In contrast to the proceedings in March and June, the mother was permitted to testify under oath at the hearing on her motion. She stated that immediately after the June hearing, in fact on the same day, she was notified by a day care center that it would take the child and by her landlord that her child could live with her. She related her futile attempts to notify the attorney representing the SRA and, also, equally futile attempts to have her court-appointed lawyer take further legal action. On cross-examination, however, she testified that the application for day care was dated June 14, that the letter from the landlord was dated June 11, and that she notified her court-appointed attorney of these developments in a letter of August 21.[10] The mother explained that she received oral notifications on June 7 and the written notifications later. No further testimony was taken and on January 2, 1975, the trial judge entered an order adopting as his own the findings of the first trial judge and denying the motion.
This is not the typical child custody dispute in which each parent is vying for a child's custody or in which foster parents attempt to adopt a child and the parents contest the adoption by withholding consent. Here an agency of the District of Columbia seeks to terminate parental rights over the mother's objection simply to facilitate potential adoption proceedings. The DHR's rationale for seeking termination is based on the requirement of D.C.Code 1973, § 16-304 that before the court will grant an adoption petition the parents must give their consent. If a parent withholds consent, the court can nevertheless grant the adoption petition:
(d) When a parent whose consent is hereinbefore required, after such notice as the court directs, cannot be located, or has abandoned the prospective adoptee and voluntarily failed to contribute to his support for a period of at least six months next preceding the date of the filing of the petition, the consent of that parent is not required.
(e) The court may grant a petition for adoption without any of the consents specified in this section, when the court finds, after a hearing, that the consent or consents are withheld contrary to the best interests of the child.[11]
Although the Code permits a court to terminate parental rights, it is only in the context of an adoption proceeding and the sine qua non is that the adoptive parents petition the court for the child. Unless the child is abandoned and the parents cannot be located, however, a petition for adoption will often lead to a confrontation between the natural parents and the adoptive parents.[12] This confrontation is avoided if the parental rights are terminated in a separate and distinct proceeding held prior to an adoption petition. The DHR is then more likely to succeed in placing children for adoption as prospective adoptive parents are more willing to petition the court if the final outcome is not dependent upon a court fight over consent. Thus, the adoption procedure is administratively simplified if parental rights are terminated before an adoption petition is filed.
For these reasons, the DHR initiates termination proceedings under the Family Division Proceedings of D.C.Code 1973, § *339 16-2301 et seq. and pursuant to Super.Ct. Neg.R. 18(c). Specifically, § 16-2320(a) of the Code provides that upon an adjudication of neglect the court has several remedies: it may allow the child to remain with the parent subject to court imposed conditions; it may place the child under protective supervision; it may transfer legal custody to a public or private agency or a relative; and, if necessary, it may order medical or psychiatric care for the child.[13] While the section does not provide as a remedy the termination of parental rights, it does authorize the court to "[m]ake such other disposition as may be provided by law and as the Division deems to be in the best interest of the child and the community." This reference to the court's plenary power, when read in conjunction with other sections of the Code which envision the termination of parental rights, is apparently the statutory basis for Super.Ct.Neg.R. 18(c).[14] The advisory comment on Rule 18(c) states:
Section (c) sets forth a procedure for the permanent termination of parental rights. While the District of Columbia Code takes cognizance in numerous sections of court-ordered termination of parental rights, the Code is silent on the standards or criteria upon which the granting of such a remedy should be based. (See D.C.Code § 3-117 (1973 ed.) and D.C.Code, § 16-301 et seq. and § 32-786 (1973 ed.). Further, there are no appellate decisions in this jurisdiction (as of September 27, 1973) which provide substantive criteria for the permanent termination of parental rights.. . .
As we have noted, D.C.Code 1973, § 16-301 et seq. requires parental consent to adoption except in certain circumstances. It also requires that consent be obtained "from a licensed child-placing agency or the Commissioner in case the parental rights of the parent or parents have been terminated by a court of competent jurisdiction. . . ."[15] To implement this provision, D.C.Code 1973, § 32-786 provides that:
(a) Whenever a licensed child-placing agency shall have been given the permanent care and guardianship of any child and the rights of the parent or parents of such child shall have been terminated by order of a court of competent jurisdiction *340 diction or by a legally executed relinquishment of parental rights, the agency is vested with parental rights and may consent to the adoption of the child pursuant to the statutes regulating adoption procedure. . . . [Emphasis added.]
and D.C.Code 1973, § 3-117(3) (Supp. II, 1975), provides that the Commissioner may
consent to, arrange for or initiate court proceedings for the adoption of all children committed to the care of the Commissioner whose parents have been permanently deprived of custody by court order, or whose parents have relinquished a child to the Commissioner or to a licensed child-placing agency which has transferred the relinquishment to the Commissioner under section 32-786.[16] [Emphasis added.]
In addition to these references, termination of parental rights is also referred to in the recently enacted D.C.Court Reform and Criminal Procedure Act of 1970.[17] In particular, D.C.Code 1973, § 16-2301(20)(D), (22), the definitional section of the Family Division Proceedings, states:
(20) The term "guardianship of the person of a minor" means the duty and authority to make important decisions in matters having a permanent effect on the life and development of the minor, and concern with his general welfare. It includes (but is not limited to) 
* * * * * *
(D) the authority to exercise residual parental rights and responsibilities when the rights of his parents or only living parent have been judicially terminated or when both parents are dead. [Emphasis added.]
* * * * *
(22) The term "residual parental rights and responsibilities" means those rights and responsibilities remaining with the parent after transfer of legal custody or guardianship of the person, including (but not limited to) the right of visitation, consent to adoption, and determination of religious affiliation and the responsibility for support. [Emphasis added.]
Thus, in three different Code sections three distinct parties are empowered to consent to adoption; viz, a licensed child-placing agency, the Commissioner, and the guardian of the person of a minor. As a prerequisite to exercising this power, however, parental rights must have been judicially terminated.[18]
Clearly the Congress, in enacting the various sections of the Code, contemplated the judicial termination of parental rights. However, all references to termination are couched in terms of consent to adoption. As we have noted, consent is the first matter to be resolved in an adoption proceeding and three procedures are available for this resolution. First, the parents may freely give their consent; second, the court may waive parental consent; and third, a licensed child-placing agency, the Commissioner, or a guardian may give the necessary consent. Under the first, a definite statutory scheme exists, i. e., parents must be notified that a petition has been filed and the court cannot grant the adoption petition unless the parents' consent has been given.[19] Under the second, the court *341 must hold a hearing and determine that the parents have either abandoned the child or are withholding their consent contrary to the child's best interests.[20] Under the third, the parental rights must have been judicially terminated before consent may be given. While the Code provides some legal criteria for the first two procedures, it is silent on either the procedures or standards to be used by a court in terminating parental rights. This imperfection in the Code has not gone unnoticed and an attempt to remedy it was made by enacting Super.Ct.Neg.R. 18(c).[21]
The District's practice of bringing neglect charges against parents who voluntarily surrender a child to its care was questioned in In re: Neglect Cases, 101 Wash.D.L.Rep. 1601 (Aug. 16, 17, 1973). There Superior Court Judge William E. Stewart, Jr., recognized two distinct types of neglect cases: (1) the ordinary neglect case in which the District itself initiates neglect proceedings against the parents pursuant to D.C.Code 1973, § 16-2301(9)(B);[22] and (2) the relinquishment case in which the parents surrender their children to the District's care because they are unwilling to provide necessary support but, nonetheless, refuse to consent to adoption. As to this distinction between relinquishment and bona fide neglect, Judge Stewart stated:
It is one thing to have the state come into a home, declare the parents neglectful and remove the children and quite another for a parent to refuse when able to take the responsibility for those he has brought into the world and frustrate the state's efforts to give the child a permanent home with costs to the taxpayers. The court resists the government's efforts to lump these clearly distinguishable types of cases within subsection (B) of the neglect statute. If the problem is that parents are able yet unwilling to provide necessary care while simultaneously refusing to consent to adoption certainly a statute could be drafted providing that relinquishment would, after a certain period of time, be grounds for the termination of parental rights. Stated otherwise, if the relinquishment problem is as serious as the government suggests it is, the situation is deserving of its own specifically delineated statute.. . . [In re: Neglect Cases, supra at 1621 (Aug. 17, 1973).]
In a later opinion, In the Matter of J. S. R., 102 Wash.D.L.Rep. 1393, 1396 (July 10, 1974), Superior Court Judge Orman W. Ketcham, in a proceeding to determine whether a mother was withholding consent to adoption contrary to her child's best interest, questioned the basic legality of Super.Ct.Neg.R. 18(c):
The Court was met at the outset by the biological mother's motion to dismiss the Motion to Terminate Parental Rights. She contended that the Court lacks jurisdiction to terminate the parental rights of a biological mother in a neglect case. Counsel correctly points out that the District of Columbia Code is silent as to whether parental rights can be terminated under a neglect petition. In Super.Ct.Neg.R. 18(c), the Board of Judges of this Court recently provided certain procedural requirements for the termination of parental rights if a judge deemed it to be in the best interest of the child. But such substantive issues as the rights of parents should be the subject of legislation rather than the rulemaking authority of judges. The Court invites the attention of the United States Congress to this serious oversight in the D.C. Court Reform and the Criminal Procedure Act of 1970. (P.L. 91-358).[23]
*342 Having outlined the problem which the District faces in dealing with parents who balk at shouldering their parental responsibilities and having noted the doubts expressed concerning the propriety of terminating parental rights in a neglect proceeding, we now examine whether the Superior Court, despite the lack of specific legislative authority, has the power to terminate parental rights pursuant to Super.Ct.Neg.R. 18(c). In discussing this lack of termination legislation, we first point out that the District of Columbia is one of the few jurisdictions which has no such statute. The American Bar Association Section of Family Law has recently completed a survey of all state child neglect laws and published the results in Katz, Howe, McGrath, Child Neglect Laws in America, 9 Fam.L. Q. 1 (Spring 1975) (hereinafter cited as Katz). The survey which included all the states, the District of Columbia, Guam, Puerto Rico, and the Virgin Islands, discloses that forty-three jurisdictions provide in their neglect laws for the termination of parental rights.[24] Twenty-three of the states require termination proceedings to be separate and distinct from the neglect proceedings.[25] Additionally, more than half of the statutes on termination have been amended since 1970.[26] The relevance of this survey is that it shows that the majority of states recognize the need for termination and provide for it by statute. Additionally, it discloses that the most common statutory grounds for termination are abandonment (37 statutes) and neglect (35 statutes).[27] Thus, the District, in seeking to terminate parental rights for neglect, is not taking an unreasonable nor untenable position. Indeed, on the question of neglect and termination the United States Department of Health, Education and Welfare, Legislative guides for the termination of parental rights and responsibilities and the adoption of children (Children's Bureau Publication Number 394-1961, reprinted 1968), states at 15:
Where neglect is substantial and continuous or repeated, it is plain that the child is seriously in need of new parental relationships. It is recommended that wherever possible, social services be made available to the parents to help them understand and meet their responsibilities towards the child, and that only if despite these services the neglect continues or is repeated should termination action be started. These situations are distinguishable from ordinary neglect which can be dealt with constructively in ways other than termination.
While there is agreement that neglect should be a ground for termination, the critical issue is whether the power to sever the parent-child relationship can be conferred on the court by adoption of a rule *343 of procedure. The power to adopt rules is given to Superior Court by Congress and is embodied in D.C.Code 1973, § 11-946 which states:
The Superior Court shall conduct its business according to the Federal Rules of Civil Procedure and the Federal Rules of Criminal Procedure (except as otherwise provided in title 23) unless it prescribes or adopts rules which modify those Rules. Rules which modify the Federal Rules shall be submitted for the approval of the District of Columbia Court of Appeals, and they shall not take effect until approved by that court. The Superior Court may adopt and enforce other rules as it may deem necessary without the approval of the District of Columbia Court of Appeals if such rules do not modify the Federal Rules. The Superior Court may appoint a committee of lawyers to advise it in the performance of its duties under this section.
There is no counterpart of the neglect rules in the federal rules so the Superior Court is free to adopt such rules as it deems necessary. But that freedom is limited to enacting rules which govern procedure. Accordingly, Super.Ct.Neg.R. 1(a) provides that "[t]hese rules govern the procedure . . . in all proceedings in which a child is alleged to be neglected. . . ." [Emphasis supplied.] It is also significant that while the Supreme Court has the power to prescribe rules of procedure for the federal district and appellate courts, it may not adopt rules which "abridge, enlarge or modify any substantive right . . . ." 28 U.S.C. § 2072 (1970). Although the Superior Court derives its power not from § 2072 but from D.C.Code 1973, § 11-946, we believe, nonetheless, that Congress in enacting § 11-946 did not intend to grant a power to the Superior Court which it withheld from the Supreme Court.
In Campbell v. United States, D.C.App., 295 A.2d 498, 501 (1972), we ruled that if a Superior Court rule is identical to or substantially identical to a corresponding federal rule, it would have, just as the federal rule, the force and effect of law. While there are no corresponding federal neglect rules, we nonetheless look to the scope and effect of the federal rules for guidance in determining the scope and effect of the Superior Court rules. Recognizing this dichotomy which exists in the federal sphere between substantive rights and procedural rules, it is clear that the Superior Court exceeded its statutory grant of power by enacting a procedural rule which abridges a substantive right of a parent, i. e., permanently severs the parent-child relationship in a non-adoption type proceeding. Although the substantive right of a parent to the custody of a child has never been judicially defined, it has been recognized in numerous Supreme Court opinions, most recently in Stanley v. Illinois, 405 U.S. 645, 651, 92 S.Ct. 1208, 1212, 31 L.Ed.2d 551 (1971), in which the Court observed:
The Court has frequently emphasized the importance of the family. The rights to conceive and to raise one's children have been deemed "essential," Meyer v. Nebraska, 262 U.S. 390, 399, 43 S. Ct. 625, 626, 67 L.Ed. 1042 (1923), "basic civil rights of man," Skinner v. Oklahoma, 316 U.S. 535, 541, 62 S.Ct. 1110, 1113, 86 L.Ed. 1655 (1942), and "[r]ights far more precious . . . than property rights," May v. Anderson, 345 U.S. 528, 533, 73 S.Ct. 840, 843, 97 L.Ed. 1221 (1953). "It is cardinal with us that the custody, care and nurture of the child reside first in the parents, whose primary function and freedom include preparation for obligations the state can neither supply nor hinder." Prince v. Massachusetts, 321 U.S. 158, 166, 64 S.Ct. 438, 442, 88 L.Ed. 645 (1944). The integrity of the family unit has found protection in the Due Process Clause of the Fourteenth Amendment, Meyer v. Nebraska, supra, 262 U.S. at 399, 43 S.Ct. at 626, the Equal Protection *344 Clause of the Fourteenth Amendment, Skinner v. Oklahoma, supra, 316 U.S. at 541, and the Ninth Amendment, Griswold v. Connecticut, 381 U.S. 479, 496, 85 S.Ct. 1678, 14 L.Ed.2d 510 (1965) (Goldberg, J., concurring).[28]
We recognize, of course, that the parent-child relationship is not totally immune from governmental interference. The manner and grounds for such interference are provided for in the District's adoption in neglect laws. As this is not an adoption proceeding, the basis for Super. Ct.Neg.R. 18(c) must be grounded in the child neglect provisions of D.C.Code 1973, § 16-2301 et seq., and as we have shown, there is no provision there for the termination of parental rights. Indeed, an examination of the rule and the advisory committee's comment on it reveals that the rule is more akin to legislation than to procedure. The rule itself states that the court should "give due consideration to the interests of the child's parents"; that it should also consider the child's best interest; that a fact-finding hearing must be held; and that "diligent efforts [be] made to give notice of said hearing to all parties affected by such order." The comment to the rule notes that the D.C.Code is silent on any criteria for termination and, likewise, that there is no appellate decision setting out criteria for termination. The comment gives three examples of parental conduct which justify termination; abandonment, severe abuse which endangers the child's life or health, and incarceration, hospitalization or other mental or physical incapacity of the parent which is likely to continue until the child's twenty-first birthday. These examples are derived from court decisions in other jurisdictions and the comment cautions that they are for informational purposes only.
In attempting to remedy a recognized deficiency in the District of Columbia Code, the Superior Court has adopted a rule which abridges a substantive right. We conclude, therefore, that the Superior Court is without jurisdiction to terminate parental rights pursuant to Super.Ct.Neg. R. 18(c).
We briefly examine the contention raised by the Corporation Counsel in an amicus curiae memorandum that Superior Court has the inherent power, acting as parens patriae, to terminate parental rights and that Congress by repeated reference to termination in the D.C.Code intended the court to exercise it in neglect proceedings. We do not dispute the existence of the parens patriae power in the Superior Court or the Superior Court's duty to exercise it in the proper circumstances.[29] Reliance on it in neglect *345 proceedings is misplaced, however, for it is clear that the sole purpose of termination in such proceedings is to facilitate adoption. The legislature has provided a procedure for termination in an adoption proceeding and if such procedure is cumbersome or ineffective, the solution is for Congress to amend the law and not for the Superior Court, by reliance on the amorphous concept of parens patriae, to do so. As long as there exists a statutory procedure to accomplish termination, the District and the Superior Court must follow it despite its administrative shortcomings.
The order terminating parental rights is vacated and the case is remanded for a hearing to determine whether the custody of the child should be retained by the OHR.
So ordered.
NOTES
[1] Termination of Parental Rights.

The Division may enter an order for the permanent termination of parental rights where, after giving due consideration to the interests of the child's parents, guardian, custodian or other interested party, the court finds that such termination of parental rights is in the best interest of the child and is consistent with the law of the District of Columbia. No order terminating parental rights shall be entered until a factfinding hearing has been held and diligent efforts have been made to give notice of said hearing to all parties affected by such order. If parental rights are terminated, the department, agency or institution to which the child has been committed shall have complete custody rights, including but not limited to the right to consent to adoption of the child.
[2] D.C.Code 1973, § 16-304 requires parental consent before adoption except in certain circumstances.
[3] D.C.Code 1973, § 16-2301(9) (B) provides:

The term "neglected child" means a child 
* * * * *
(B) who is without proper parental care or control, subsistence, education as required by law, or other care or control necessary for his physical, mental, or emotional health, and the deprivation is not due to the lack of financial means of his parent, guardian, or other custodian . . . .
[4] D.C.Code 1973, § 16-2320 provides in pertinent part:

(a) If a child is found to be neglected, the Division may order any of the following dispositions which will be in the best interest of the child:
* * * * *
(3) Transfer legal custody to any of the following 
(A) a public agency responsible for the care of neglected children . . . .
[5] D.C.Code 1973, § 16-2322 provides in part:

(a) (1) A dispositional order vesting legal custody of a child in a department, agency, or institution shall remain in force for an indeterminate period not exceeding two years. . . .
* * * * *
(b) A dispositional order vesting legal custody of a child in an agency or institution may be extended for additional periods of one year, upon motion of the department, agency, or institution to which the child was committed, if, after notice and hearing, the Division finds that 
(1) in the case of a neglected child, the extension is necessary to safeguard his welfare. . . .
[6] D.C.Code 1973, § 16-2304 requires that the parents and where appropriate the child be represented by counsel at all critical stages of a neglect proceeding. D.C.App.R. 46 III et seq. permits law student representation.
[7] The mother stated that she earned $370 per month as an employee of the General Services Administration.
[8] The father, who was notified by registered mail, was represented in court by an attorney who made no objection to the termination.
[9] Super.Ct.Neg.R. 18(b) requires in neglect proceedings, after entering a dispositional order, that the court inform the parties of the right to appeal.
[10] The letters are not part of the record on appeal.
[11] D.C.Code 1973, § 16-304.
[12] D.C.Code 1973, § 16-306(a) provides:

Except as provided by subsection (b) of this section, due notice of pending adoption proceedings shall be given to each person whose consent is necessary thereto, immediately upon the filing of a petition. The notice shall be given by summons, by registered letter sent to the addressee only, or otherwise as ordered by the court.
[13] The full text of D.C.Code 1973, § 16-2320 (a) reads:

(a) If a child is found to be neglected, the Division may order any of the following dispositions which will be in the best interest of the child:
(1) Permit the child to remain with his parent, guardian, or other custodian, subject to such conditions and limitations as the Division may prescribe, including but not limited to medical, psychiatric, or other treatment at an appropriate facility on an out-patient basis.
(2) Place the child under protective supervision.
(3) Transfer legal custody to any of the following
(A) a public agency responsible for the care of neglected children;
(B) a child placing agency or other private organization or facility which is licensed or otherwise authorized by law and is designated by the Commissioner of the District of Columbia to receive and provide care for the child; or
(C) a relative or other individual who is found by the Division to be qualified to receive and care for the child.
(4) Commitment of the child for medical, psychiatric, or other treatment at an appropriate facility on an in-patient basis if, at the dispositional hearing provided for in section 16-2317, the Division finds that confinement is necessary to the treatment of the child. A child for whom medical, psychiatric, or other treatment is ordered may petition the Division for review of the order thirty days after treatment under the order has commenced, and, if, after a hearing for the purpose of such review, the original order is affirmed, the child may petition for review thereafter every six months.
(5) Make such other disposition as may be provided by law and as the Division deems to be in the best interests of the child and the community.
[14] Supra note 1.
[15] D.C.Code 1973, § 16-304(b) (F).
[16] This section was amended by the Act of Jan. 2, 1974, Pub.L. No. 93-241, 87 Stat. 1057, 1061. Previously the pertinent part read:

The Board shall have full power . . . (3) to consent to the adoption of all children committed to its care whose parents have been permanently deprived of custody by court order.
[17] Act of July 29, 1970, Pub.L. No. 91-358, 84 Stat. 473.
[18] Although the phrase in D.C.Code 1973, § 3-117(3) (Supp. II, 1975), "whose parents have been permanently deprived of custody by court order" is neither defined nor repeated in the Code, we consider it to be synonymous with the termination of parental rights.
[19] D.C.Code 1973, §§ 16-306, -304(a). There also is a procedure whereby parental rights may be voluntarily relinquished and in such case consent is not necessary as it has in effect been given. However, that procedure is not germane to the issue here. See D.C.Code. 1973, § 32-786.
[20] D.C.Code 1973, § 16-304(d) (e).
[21] Supra note 1.
[22] See supra note 3.
[23] The court had before it both a petition for adoption and a motion to terminate parental rights. It ultimately ruled on the adoption petition and therefore did not have to decide whether it had the inherent power to terminate parental rights under Rule 18 (c).
[24] Katz, supra at 66.
[25] Id. at 67. On this point, we also note a recent article, Areen, Intervention Between Parent and Child: A Reappraisal of the State's Role in Child Neglect and Abuse Cases, 63 Geo.L.J. 887, 928-29 (March 1975) (hereinafter cited as Areen), in which the author in commenting on the problem of neglected children whose parents refuse to consent to adoption states that:

States have devised three ways to overcome these problems. Thirty states provide that parental consent can be waived at the adoption hearing if the child has been abandoned, or if such a waiver appears to be in the best interests of the child. Eleven provide that all parental rights, including the power to veto adoption, may be terminated at the hearing in which a child is declared to be neglected. A third group of states provides for a separate hearing on the issue of terminating parental rights, which may be called only after a child has been declared neglected and placed temporarily in the custody of the state. [Footnotes omitted.]
In the third group the author places twenty-four jurisdictions which is one more than Katz, supra. [See Areen, id. at 929 n. 213, which catalogues these jurisdictions and gives the citations to their laws.]
[26] Katz, supra at 67.
[27] Id.
[28] There are very few federal decisions which discuss the parent-child relationship since this is an area of law that has been habitually left to the states. See, e. g., Hernstadt v. Hernstadt, 373 F.2d 316, 317 (2d Cir. 1967). Additionally, as there is no termination statute in the District, there is no case law on this exact point. Appellate decisions in his jurisdiction normally arise in the context of adoption proceedings. See, e. g., In re S.F.D., D.C.App., 324 A.2d 200 (1974).
[29] The Supreme Court in N.Y. Life Ins. Co. v. Bangs, 103 U.S. 580, 581, 20 L.Ed. 608 (1881), stated of parens patriae:

This jurisdiction in the English courts of chancery is supposed to have originated in the prerogative of the Crown, arising from its general duty as parens patriae to protect persons who have no other rightful protector. But partaking, says Story, as the prerogative does, more of the nature of a judicial administration of rights and duties in foro conscientiae than of a strict executive authority, it was very naturally exercised by the court of chancery as a branch of its original general jurisdiction. "Accordingly," he adds, "The doctrine now commonly maintained is, that the general superintendence and protective jurisdiction of the court of chancery over the persons and property of infants is a delegation of the rights and duty of the Crown; that it belonged to that court and was exercised by it from its first establishment; and that this general jurisdiction was not even suspended by the Statute of Henry VIII, erecting the court of wards and liveries." The jurisdiction possessed by the English courts of chancery from this supposed delegation of the authority of the Crown as parens patriae is more frequently exercised in this country by the courts of the States than by the courts of the United States. It is the state and not the Federal Government, except in the territories and the District of Columbia, which stands, with reference to the persons and property of infants, in the situation of parens patriae. . . .