**In re A.W.**

**Appeal of A.W. a/k/a D.M.**

**No. 89–15.**

District of Columbia Court of Appeals.

Submitted Sept. 19, 1989.
Decided Jan. 24, 1990.

Beth Goodman, Washington, D.C., appointed by this court, was on the brief, for appellant.

Sumner J. Katz, appointed by this court, was on the brief, for appellee.

Frederick D. Cooke, Jr., Corp. Counsel at the time the statement was filed, Charles L. Reischel, Deputy Corp. Counsel, and Charlotte M. Brookins, Asst. Corp. Counsel, Washington, D.C., filed a statement in lieu of brief, for appellee District of Columbia.

Before ROGERS, Chief Judge, and SCHWELB and FARRELL, Associate Judges.

FARRELL, Associate Judge:

Appellant challenges an order of the Family Division terminating the natural parental relationship between herself and her

two-year-old son, A.W.[1] Her primary contention is that, since there was no testimony at the hearing about the actual prospects for adoption of A.W., the record does not support the trial judge's finding that termination would promote the child's "timely integration into a stable and permanent home," D.C.Code § 16–2353(b)(1) (1989), which is one factor the court must consider before extinguishing natural parental rights. Because we conclude that the evidence on this and the other statutory factors was sufficient to support a conclusion, by clear and convincing evidence, that termination was in the best interest of the child, D.C.Code § 16–2359(f), we affirm the order of the trial court.

## I.

These proceedings began on February 10, 1987, when the District of Columbia filed a neglect petition alleging that A.W. had been abandoned and was a neglected child pursuant to D.C.Code § 16–2301(9)(A), (B) and (C). On May 5, 1987, a stipulation was agreed to by the mother and approved by the court. In the stipulation the mother acknowledged that she had a history of drug abuse, including free-basing cocaine; that A.W. had been born suffering from drug withdrawal; that the mother's drug use impaired her ability to plan for and provide care for the child; and that she had failed to maintain a parental relationship with A.W. She further agreed to the commitment of the child to the Department of Human Services (DHS), and she promised to maintain a regular schedule of visits with A.W., secure stable housing and income, and follow through with all referrals, including those for drug counseling.

As the trial court found, however:

[The mother] failed to meet any of those conditions. Instead, for nearly a year until she was incarcerated in April, 1988, her whereabouts were unknown and she had no contact with any of the social workers assigned to the case, or with [A.W.]. Her life had again descended into drug usage, which led to her arrest, incarceration, and total abandonment of [A.W.].

There had been no contact by [the mother] with [A.W.] since he was a newborn baby. She failed to plan for his discharge from the hospital and even after [A.W.] was placed in a foster home and later adjudicated a neglected child, she failed to plan for visits with him or take other steps necessary for her to put herself in a position to care for him. Not until after she was again incarcerated in April, 1988 did she even request to see [A.W.].

Accordingly, on December 31, 1987, counsel appointed to represent the child filed a motion to terminate the parent and child relationship. After hearing testimony by DHS officials recommending termination, and by the mother in support of her desire to be reunited with A.W., the court found by clear and convincing evidence that termination was in the best interests of the child. Specifically, the court found that, given the mother's

history of criminal conduct, her prior periods of incarceration, her long history of drug abuse, and her behavior, including her conduct after the neglect stipulation was entered into, ... there is no likelihood that she would be able to put herself in a position in the near future to be a fit parent for [A.W.] or to provide the continuity and minimal quality of care needed for responsibly parenting the respondent.

The court also made findings with respect to A.W., who was two years old at the time of the hearing:

After [the mother] failed to plan for [A.W.'s] discharge from the hospital, [A.W.] was placed in a foster home in January, 1987. He has been in the same foster home ever since. He has bonded well to the foster parents and to other persons both in the foster home and in the extended family of the foster parents. His health is good. He is develop-

---

**1.** The court also terminated the parental rights of a man who the court assumed, solely for the sake of argument, was the natural father, although paternity had not been established. No challenge has been made to that determination.

ing well emotionally and physically. Given his age and overall health, he is considered very suitable for adoption at this time.

## II.

Appellant mounts no serious challenge to these findings by the trial court regarding both her unfitness to be a parent for A.W. in the near future and the child's general suitability for adoption. Rather, her primary challenge is to the next part of the trial court's reasoning in ordering termination:

> The alternative [to immediate termination] of waiting for an indeterminate period to see if [the mother], after so many years of problems, can someday provide a stable home for [A.W.] is unacceptable. It simply would place [A.W.] in a "legal limbo" even further since nobody is going to proceed with a permanent plan of adoption as long as the mother is still in the picture. In essence, waiting to see if the mother can turn her life around would effectively prevent [A.W.] from having the possibility of a secure permanent placement. The prospect of terminating the parental relationship and removing the legal impediment to adoption provides a much greater likelihood of continuity for [A.W.] than does the possibility of [the mother], after her years of problems, somehow miraculously pulling herself together and providing a stable home.

Appellant disputes the premise of this reasoning that "removing the legal impediment to adoption" would materially advance the prospects for adoption of A.W. Pointing out that termination must be shown to promote the "timely integration [of the child] into a stable and permanent home," D.C.Code § 16–2353(b)(1), appellant cites the testimony by DHS officials that the foster parents with whom A.W. resided were elderly and therefore were not regarded by DHS as eligible to adopt the child, although "there are exceptions" to the age requirement. As there was no testimony that prospective adoptive parents had been identified for A.W., appellant contends that termination of her parental rights was premature and the court should have ordered further efforts at reunification with the natural mother.

More broadly, appellant appears to argue that the trial court could not rely on its presumption that termination would enhance the likelihood of adoptive placement of a child otherwise as well-suited as A.W. without evidence about the actual prospects for his adoption or the adoption of similar children in DHS's custody. In this case, appellant points out, no one from DHS testified about A.W.'s prospects for adoption other than to say that the foster parents were not likely candidates. The possibility remains, therefore, that A.W. will not be placed with adoptive parents in the foreseeable future no matter how "suitable" he is—either because DHS has too many such children in its custody awaiting adoption, or because there are simply too few parents looking to adopt minority children, or both. The trial court's conclusion that "nobody is going to proceed with a permanent plan of adoption as long as the mother is still in the picture" may therefore be, in appellant's view, an irrelevancy. Absent concrete testimony about the realistic prospects of A.W. and similarly situated children for adoption, termination of the natural mother's parental rights can serve no other purpose than to punish her for past neglect of the child.

## III.

We conclude that appellant's first argument—that termination was premature because no adoptive parents had been identified for A.W.—misunderstands the statutory scheme enacted by the legislature to provide for termination of the parent and child relationship. As to appellant's second argument, which we consider more substantial, we hold that there is no requirement—as a matter of statutory construction or fundamental fairness—for the trial court to hear testimony in each case about the reliability or the relevance, as measured by DHS's actual experience, of the proposition that termination which is other-

wise appropriate is an effective step toward adoptive placement.

### A.

■ As this court has previously explained, Title IV of the Prevention of Child Abuse and Neglect Act of 1977 amended Chapter 16 of the D.C.Code by adding a new Subchapter III, §§ 16–2351 through –2365 (1981), to provide for termination of residual parental rights in a *neglect* proceeding, not only as part of an adoption proceeding as had been required by this court's decision in *In re C.A.P.*, 356 A.2d 335 (D.C.1976). *In re H.M.*, 386 A.2d 707, 709 & n. 2 (D.C.1978).[2] The legislative history behind Title IV explained the inadequacy of the "adoption proceeding route," which "require[d] that the Department of Human Resources find for each neglected child who should be freed adoptive parents who are willing to undertake not only the uncertainty of whether they will be ruled as qualified adoptive parents (an uncertainty all adoptive parents must undergo) but also the uncertainty of whether the child they have decided upon will be freed for adoption (an uncertainty most adoptive parents do not have to undergo)." REPORT OF THE COUNCIL OF THE DISTRICT OF COLUMBIA COMMITTEE ON THE JUDICIARY ON TITLE IV OF BILL NO. 2–048, "THE PREVENTION OF CHILD ABUSE AND NEGLECT ACT OF 1977," at 7–8 (March 29, 1977) (hereinafter "REPORT").[3] Title IV responded to this inadequacy by providing that "termination of parental rights is an additional *dispositional* option available to the court" following an adjudication of parental neglect. *Id.* at 20 (emphasis added); *see also* D.C.Code § 16–2320(a) ("If a child is found to be neglected, the [Family] Division may order any of the following dispositions[:] ... (6) Terminate the parent and child relationship for the purpose of *seeking* an adoptive placement of the child pursuant to subchapter III of this chapter") (emphasis added). Clearly, an indispensable condition that DHS already have found an adoptive parent before rights can be terminated would be inconsistent with the primary purpose of the legislation. The overarching goal of the amendment was to create as hospitable an environment as possible for potential adoptive parents of neglected children. In eliminating the former requirement that termination of parental rights occur only in the context of an adoption proceeding, the Council recognized that residual parental rights stood as a substantial deterrent to adoption, finding that "the prospective adoptive parents of a neglected child currently must assume an active adversary role with the child's parents." REPORT, *supra*, at 8.

This finding echoed our own observation in *In re C.A.P.* that "a petition for adoption will often lead to a confrontation between the natural parents and the adoptive parents." 356 A.2d at 338. We further acknowledged the utility of removing this impediment to adoption *before* prospective adoptive parents are drawn into the imbroglio:

> This confrontation is avoided if parental rights are terminated in a separate and distinct proceeding held *prior to an adoption petition*. The [DHS] is then more likely to succeed in placing children for adoption as prospective adoptive parents are more willing to petition the court if the final outcome is not dependent upon a court fight.

**2.** In *In re C.A.P.*, we held that the Superior Court had exceeded its statutory rulemaking authority by adopting a rule authorizing permanent termination of residual parental rights in child neglect cases—an impermissible abridgement of substantive rights. 356 A.2d at 343. Acknowledging that the majority of state statutes recognized the need for termination of parental rights in cases of child neglect, *id.* at 342, we nonetheless concluded that:

> [T]he sole purpose of termination in [neglect] cases is to facilitate adoption. The legislature

has provided a procedure for termination in an adoption proceeding and if such procedure is cumbersome or ineffective, the solution is for Congress to amend the law....
*Id.* at 345.

**3.** The REPORT explained: "These adoptive parents must bear not only the cost and burden of proof of a simple adoption, they must bear the cost and burden of proving that termination is in the child's best interests—both of which burdens are substantial." REPORT, *supra*, at 8.

*Id.* (emphasis added). The Council responded to the problem by establishing a "separate and distinct" proceeding. Termination was envisioned as a dispositional alternative in neglect proceedings, to be resorted to "in unusual instances," but with the expectation that it would facilitate the effort by DHS to find adoptive parents. RE-PORT, *supra,* at 2. In light of this purpose, appellant's reliance on the fact that no prospective adoptive parents had been identified for A.W. is clearly misplaced.

### B.

We likewise are unable to hold that a trial court errs by failing to require testimony by DHS officials in each case in support of the proposition that termination will enhance the prospects for adoptive placement. In this case, we emphasize, we deal with a child who is considered to be "very suitable for adoption at the present time" because of his age and physical and emotional development. We therefore do not have before us a case remotely like our recent decision in *In re A.B.E.,* 564 A.2d 751 (D.C.1989), in which we reversed a trial court's finding that termination was in the best interest of the child because there was no evidence "of any substantial good to be achieved for this child by the termination of his relationship with his natural parents...." *Id.* at 757. The child A.B.E. was twelve years old, was learning disabled perhaps from birth, and had serious emotional difficulties stemming in large part from violence inflicted on him by the natural father. Our opinion cited sociological studies depicting the severe difficulty of achieving adoptive placement for children, especially nonwhite children, with A.B.E.'s characteristics regardless of their legal status. *Id.* at 756 n. 6. We also relied on the trial court's explicit finding that "the prospect[s] for adoption, given [the child's] age, history and emotional problems, are not good...." *Id.,* n. 5. In these extreme circumstances, combined with the fact that "this parent and child relationship appear[ed] to retain some value to both A.B.E. and [his father]," we concluded that "the increase in this child's opportunity for adoptive placement, under

the circumstances of termination, [is no] more than a minimal elevation of a low chance, and thus, standing alone, an unrealistic basis for such a momentous change in this child's status." *Id.* at 757.

Our decision in *A.B.E.,* we conclude, provides no guidance on the issue whether DHS must substantiate in every case, by reference to its past or current experience, the realistic prospects for adoption that termination will advance. In this case, the trial court expressly found that A.W. "is very suitable for adoption at this time" in view of his age and health characteristics. We hold that no more was required given the unassailable finding that the mother would not be a fit guardian in the near future. To mandate an additional inquiry into the "track record" of DHS in achieving adoption in such cases would, we think, be inappropriate in light of the express legislative finding underlying passage of the 1977 Act.

Prior to enacting Title IV, the Council of the District of Columbia conducted an exhaustive study "of the whole issue of termination of parental rights in the context of neglect proceedings ... and the dispositional alternative therein of terminating parental rights." REPORT, *supra,* at 3. The committee received proposals and comment from numerous experts in the field of child neglect and adoption. *Id.* at 2–5. This study resulted in a bill "mandating at least court consideration of termination of parental rights in certain situations specified in the bill," the fundamental premise being that "[t]he sooner a child is freed for purposes of an adoptive placement, the sooner he or she will finally obtain an environment of permanence and continuity of relationships." *Id.* at 6 (emphasis added). To implement this legislative finding, the bill as enacted did basically two things. First, upon satisfaction of strict procedural requirements, D.C.Code §§ 16–2354 through –2359, it gave trial judges the authority to terminate the parent and child relationship after considering the multiple factors set forth in § 16–2353, the paramount consideration being the best inter-

ests of the child.[4] Second, once termination was ordered, it required rigorous procedures to be followed by DHS in "seeking the prompt adoptive placement" of the child, *id.* § 16–2360(b), and imposed equally strict reporting requirements to the court as to the success of those efforts. *Id.* These efforts at placement included listing the child "on all appropriate local, regional and national adoption exchanges." *Id.* If the court concluded that the agency "is not making sufficient efforts to secure an adoptive placement for the child or that inappropriate limitations have been placed on potential adoptive families," the court could order additional efforts or removal of such limitations; in an extreme case, it could transfer the power to consent to adoption to another licensed child placement agency. *Id.* § 16–2360(e).

This statutory framework was designed to carry out the two principal purposes of the statute: to provide "judicial procedures for the permanent termination of the parent and child relationship," and to "increase the opportunities for the prompt adoptive placement of children for whom parental rights *have been terminated.*" *Id.* § 16–2351(a)(1) & (3) (emphasis added). We are unable to discern anything in the statute or its purposes that requires the trial court in each case to revisit and reconfirm the motivating legislative determination that "[t]he sooner a child is freed for purposes of an adoptive placement, the sooner he or she will finally obtain an environment of permanence and continuity of relationships." REPORT, *supra*, at 6. Instead, the statute envisions that once the court finds termination to be necessary in light of the factors set forth in § 16–2353, likelihood of adoption can be achieved by rigorous enforcement of the post-termination requirements of § 16–2360. That likelihood need not be established as a prerequisite to termination in the first place.

As a factual matter, the 1977 legislative judgment that termination promotes timely adoptive placement may accord very well

with present reality in the District of Columbia; or it may accord imperfectly or poorly—we do not know. But even the "unique kind of deprivation" that termination entails, *Lassiter v. Dep't of Social Servs.*, 452 U.S. 18, 27, 101 S.Ct. 2153, 2159, 68 L.Ed.2d 640 (1981), does not require this judgment to be tested against the experience of DHS in every case before termination can be ordered. The trial court's assumption that "nobody is going to proceed with a permanent plan of adoption as long as the mother is still in the picture" comports with testimony by experts in a previous case before this court, *In re U.S.W.*, 541 A.2d 625, 626 (D.C.1988), as well as with common sense. If the reality is, nevertheless, that the prospects for adoption of children such as A.W.—who possess none of the added handicaps of the child in *A.B.E.*, *supra*—are unpromising despite the termination of natural parental rights, then the legislature may see fit to modify the statute to provide additional precautions before termination can ensue. But that is not a function of the courts.

### C.

Having said this, we emphasize that the trial court is not without discretion, in any given case, to elicit testimony from DHS officials about the practical plans and realistic expectations for adoptive placement of a particular child. Nor is counsel for the natural parent precluded from offering expert testimony about the obstacles that stand between the child in question and adoptive placement. *In re A.B.E.*, *supra*, illustrates that such testimony can help to inform more fully the court's judgment as to whether termination is truly in the best interests of the child. *See also In re U.S.W.*, *supra*, 541 A.2d at 627 (Rogers, J., concurring). We hold only that—absent the unusual circumstances presented by a case like *A.B.E.*—the reasonable prospect of adoptive placement need not be established on a case-by-case basis before termi-

---

**4.** Two key procedural requirements are that the child (a) must have been adjudicated neglected (b) at least six months before the filing of a motion for termination. § 16–2354(b). The purpose of the latter provision is to insure "time for the parents to ameliorate the conditions of the neglect." REPORT, *supra*, at 25.

nation can be ordered as a disposition in neglect proceedings.

*Affirmed.*

ROGERS, Chief Judge, dissenting:

This is not a sympathetic case in which to dissent in view of the mother's past failures to fulfill promises to care for her child. I dissent nevertheless because the statute requires that the trial judge's finding that termination is in a child's best interests must be based on "evidence presented." D.C.Code § 16–2353(a) (1989 Repl.). Given the enormity of the interests at stake and the finality of the decision, this court should construe the statutory requirement narrowly.

By § 16–2353 a judge is authorized to terminate the parent child relationship when the judge finds "from the evidence presented, after giving consideration to the interests of all parties, that termination is in the best interests of the child." The statute requires that in determining the child's best interests the judge must consider certain factors, including:

(1) the child's need for continuity of care and caretakers and for timely integration into a stable and permanent home, taking into account the differences in the development and the concept of time of children of different ages;

\* \* \* \* \* \*

(3) the quality of the interaction and interrelationship of the child with his or her parent ... and/or caretaker, including the foster parent;

The general purposes of the statute are to encourage stability in the lives of children adjudicated neglected and removed from parental custody, and to increase the opportunities for "the *prompt* adoptive placement of children for whom parental rights have been terminated." [Emphasis added] D.C.Code § 16–2351(a)(3) (1989 Repl.). It is within this statutory context that this court must review the trial court's findings that

A.W.'s parental rights should be terminated.

The majority concludes that it was sufficient for the trial judge to base his determination that termination is in A.W.'s best interests without direct evidence on the likelihood of his timely adoption and without reference to the natural mother's recent expressions of interest in her child. It concludes, further, that the findings are sufficient even though the foster parent relationship of long duration is likely to continue since the foster parents' age is likely to prevent their adoption of A.W.; there also is no evidence indicating that the foster parents wish to adopt A.W. Thus, as construed by the majority, the 1977 amendment by the Council of the District of Columbia may indefinitely consign children whose parents find themselves presently unable to provide adequate parental care to the rootless status of children without parents, natural or adoptive.

The legislative history makes clear that the Council had a two-fold motivation for addressing the services provided to the District's abused, neglected and abandoned children. First, the Council sought to impose a series of requirements which would hold social service agencies continually accountable to the court for what happens to children once they enter "the system." REPORT OF THE COUNCIL OF THE DISTRICT OF COLUMBIA COMMITTEE ON THE JUDICIARY ON TITLE IV OF BILL NO. 2–48, "THE PREVENTION OF CHILD ABUSE AND NEGLECT ACT OF 1977," at 6 (March 29, 1977) (REPORT). Second, the Council authorized the judiciary to terminate parental rights in *unusual circumstances* in the context of a neglect proceeding.[1] *Id.* at 7 & 14. The Council was concerned about gaps in services, duplication of services, and inaccessibility of services within the child abuse and neglect system. *Id.* at 5. The report noted that in 1975 the average time a child was in the District's foster care system was seven years, and that a great number of these children were "adrift in the 'system.' " *Id.* at 1, 2. The Council took the "approach

---

1. In 1976, this court held that the Superior Court had no authority to terminate parental rights outside the context of adoption proceed-

ings. *In the Matter of C.A.P.,* 356 A.2d 335 (D.C.1976).

that neglect proceedings in the Family Division must include frequent mandatory reviews of all cases, coupled with strict accountability from rehabilitative service agencies, and authorization for the court to *consider*, in *unusual instances*, terminating of parental rights ..." [emphasis added] *Id.* at 2. Accordingly, the statutory reforms in 1977 were designed to minimize the time children spent in the foster care system and motivate institutional systems previously criticized for malaise and delay to "produce services or suffer reform ordered by the judiciary." *Id.* at 6.

More than ten years later, in today's drug infested environment, parents who neglect their children as a consequence of their drug abuse are not unusual. Many children whose parents are drug abusers may find themselves forever parentless notwithstanding the fact that, in time, the natural parent may be able to assume his or her life responsibilities before any adoptive parents are located. As this court recently pointed out, there are long waiting lists of adoptable children, particularly minority children.[2] While A.W.'s mother's history hardly presents a hopeful prospect, the waiting lists, viewed in connection with the statutory requirement that the best interests determination address timely integration into a permanent and stable home, suggests that the statutory mandate that

termination be followed closely by efforts to place the child[3] is largely ineffective. Yet the amendments and legislative history make clear that the Council did not intend children to be without a legal parentage connection to anyone for long periods of time. It necessarily follows that a trial judge's consideration of the likelihood of the child's timely adoption is an integral part of the mandated assessment of whether a child's long term needs would most adequately be served by terminating the legal relationship with the child's natural parents. A stable home with two capable parents may be optimal, but adoption, for any number of reasons, is not always realistic.[4]

Further, it is clear that the Council did not intend to authorize parental termination for all children who were in foster care as a result of their parents' abuse, neglect or abandonment. The Council estimated that "at any time in 1975, there were approximately 3,000 children in foster care due to their having been abused, neglected or abandoned," *id.* at 1, and quoted a Department of Human Resources estimate that 65 children would benefit from termination and be freed for adoption as a result of the provision for parental termination of rights in the context of neglect proceedings.[5] *Id.* at 7, 8.

**2.** A report of the National Center for Social Statistics indicates that 38 percent of the children adopted in 1971 were less than one month old at the time of placement and that an additional 46 percent were 11 months of age or younger. As to difficulties placing minority children the Center reported in 1974 only 25,000 nonwhite children were adopted although 249,-600 nonwhite children were available as a result of 1974 births alone. *In the Matter of A.B.E.,* 564 A.2d 751, 756 n. 6 (D.C.1989) (quoting Note, *Racial Matching and the Adoption Dilemma: Alternatives for the Hard to Place,* 17 J. Fam.L. 333, 334 n. 9 (1978–79)). Although this report is not current and does not purport to depict the current situation in the District of Columbia, it suggests the difficult odds of adoption faced by the long lines of children waiting for a "stable and permanent home." D.C.Code § 16–2353(b)(1) (1989 Repl.). *See* note 4, *infra*.

**3.** D.C.Code § 16–2320(a)(6) (1989 Repl.).

**4.** Studies show a larger percentage of children are being freed for adoption but a smaller percentage of children are being placed in adoptive

homes, and fewer children are being adopted. Beyer & Mlyniec, *Lifelines to Biological Parents: Their Effect on Termination of Parental Rights and Permanence,* XX Fam. L. Quart. 233, 235, 246 (Summer 1986) (referencing Community Response to Children Free for Adoption in Child Welfare Research Note # 3, ACYF/DHHS (March 1984) and Allen, Golubock & Olsen, *A Guide to the Adoption Assistance and Child Welfare Act of 1980,* in Hardin, Foster Children in the Courts 576 (1983)). *See* Garrison, *Why Terminate Parental Rights?,* 35 Stan.L.Rev. 423, 472 (February 1983) (citing New York State Child Welfare Information Service, Summary of Characteristics of Children in Care or Recently Discharged (Sept. 30, 1980)).

**5.** The executive branch expressed concern that parental terminations within the context of neglect proceedings would take on a punitive character. Report, Major Issue Analysis Statement, "Attachment C" at 1. To the extent that trial court findings focus the evaluation on the flaws of the child's parents, the trial court fails to consider and compare two important factors:

For these reasons, I conclude that the majority's interpretation of the statutory requirement that termination need not be tied to consideration of a timely adoption prospect is flawed. This is not to say, as the majority would have it, *see* majority opinion at 171, that adoptive parents must be identified, but rather that there must be evidence presented in each case regarding the agency's assessment of how long it is likely to take to place the child in view of the agency's track record and the information it then has indicating that there are persons interested in adopting someone like the child whose parents' parental rights are about to be terminated. Although the Council presumed that a provision for parental termination outside the context of an adoption proceeding would encourage prospective adoptive parents, the Council did so in limited circumstances and did not find that *no* potential adoptive parents would step forward absent a prior termination of parental rights. The Council sought, in unusual instances, to free prospective adoptive parents of the costs and burden of proving that termination is in the child's best interests and spare them from assuming an active adversarial role with the child's parents. REPORT at 8. Prospective adoptive parents are freed of this burden whether or not the biological parents' rights are terminated before or after the adoptive parents express an interest in adoption. Furthermore, contrary to the trial judge's "legal limbo" finding, quoted in the majority opinion at 4, for which there is no record support, persons interested in adoption have proceeded in the face of these burdens and children have been adopted nonetheless. In view of the statutory requirement that the judge rely on "evidence ˙ presented," D.C.Code § 16–2353(a), there can be no justification for affirmance here on the basis of this finding.

(1) the potential good that the parents might offer, even in an incapacitated state; and (2) the child's realistic chance for a "timely adoption." *Similarly,* the trial judge's speculative finding that "nobody is going to proceed with a permanent plan of adoption as long as the mother is

Acknowledging that "the best-interests-of-the-child standard is vague at best," [6] the Council concluded that the trial judge required "the utmost data concerning the child and his or her environment. The idea is that with increased data will come enlightenment concerning what is in the best interest of the child." [7] Consequently, even if the Council had not explicitly directed the trial judge to consider the child's need for timely adoption as part of the best interests analysis, it would be an important, relevant, and weighty factor in any best interests analysis. In view of the relationship being permanently terminated, the trial court can do no less than evaluate, on the basis of record evidence, a particular child's actual adoptability and the likely prospects for the child's timely adoption in determining where a particular child's best interests lie, particularly since reliance on rigorous agency enforcement of § 16–2360's post-termination procedures appears illusory in view of waiting lists and agency staffing shortages. Under the majority's analysis, terminating A.W.'s parents' rights does not assure that A.W. will ever be adopted, much less in a "timely" manner. Yet. A.W.'s best interests can only be served, consistent with the plain language of the statute, and supported by the legislative history, by a realistic assessment of the alternatives available to meet A.W.'s long-term needs.

Significantly, the majority makes no reference to the evidence that the mother, while incarcerated, requested visitation with A.W. and expressed the desire to be reunified with A.W. Although the record indicates no stated reason, she has been prevented from visiting with A.W. notwithstanding her release to a halfway house during the termination proceeding. Combined with the evidence of A.W.'s positive adjustment in his foster home, and the absence of any evidence that family permanency will be "timely" after termination,

in the picture," directs the analysis away from the best interests of the child.

6. REPORT at 8.

7. *Id.*

the government's refusal to the mother to visit with her child poses serious questions about whether A.W.'s best interests have been adequately assessed. In the end, premature parental termination may assure A.W. of the very circumstances that the Council sought to avoid: the agony of a rootless child who remains adrift in foster care system without *any* permanent familial relationships.