**In re D.G., an Infant.**

**Appeal of D.G.**

**No. 88–1635.**

District of Columbia Court of Appeals.

Argued June 19, 1990.
Decided Dec. 3, 1990.

Hubert H. Margolies, Washington, D.C., appointed by the court, for appellant D.G. (mother).

Robert E. Sylvester, Washington, D.C., for appellee D.G. (child).

Herbert O. Reid, Corp. Counsel, Charles L. Reischel, Deputy Corp. Counsel, and Mary L. Wilson, Asst. Corp. Counsel, Washington, D.C., filed a memorandum in lieu of brief, for appellee District of Columbia.

Before ROGERS, Chief Judge, and TERRY and FARRELL, Associate Judges.

TERRY, Associate Judge:

This is an appeal from an order terminating parental rights under D.C.Code § 16-2353 (1989). Appellant, D.G.'s natural mother, argues that the Department of Human Services (DHS) failed to make "reasonable efforts" to reunite the family prior to termination, and that this failure violated the federal Adoption Assistance and Child Welfare Act (CWA).[1] We hold that the CWA does not confer standing on appellant to demand relief of the type she seeks.

There has been, however, a significant change in circumstances since the trial court's decision to terminate appellant's parental rights. D.G.'s adoption, which appeared to be imminent at the time of the termination proceedings, is no longer a realistic possibility. Because we do not know how much importance the trial court attached to the prospect of adoption, we vacate the termination order and remand the case for further consideration in light of this change in circumstances.

---

1. Pub. L. No. 96–272, 94 Stat. 500 (1980) (codified as amended at 42 U.S.C. §§ 620–676 (1988)).

I

D.G. was born on June 29, 1976. In 1982 his mother [2] placed him and his sister in the emergency care of DHS. After six weeks without contact, the mother re-established ties with her children, and they were returned to her care. On December 18, 1984, the mother again abandoned her two children at a DHS office, explaining in a note that she was mentally ill and suicidal, and that she wanted no further relationship with her children. D.G. was placed in a foster home on January 19, 1985. In early February the Corporation Counsel filed a neglect petition in the Superior Court, alleging that D.G. had been abandoned by his mother, and a few days later the court entered an order placing D.G. in the custody of DHS. His mother was granted supervised visitation rights.

After several attempts were made to provide D.G.'s mother with assistance, DHS conducted an administrative review of his case at a hearing in September 1986. As a result of that review, DHS determined that reunification of D.G. with his natural mother was an unrealistic goal and that, given the mother's unwillingness to plan for D.G.'s return to her custody, adoption was in the child's best interest. When a case worker informed D.G.'s mother of the agency recommendation of adoption, the mother did not request visitation or any assistance in seeking reunification.

On August 27, 1987, a motion to terminate the parent-child relationship was filed by D.G.'s attorney in the still-pending neglect proceeding. After an evidentiary hearing, the court entered an order granting the motion, from which this appeal is taken.

The first witness was Denise Keeling, a social worker with the adoption unit of DHS, who had been assigned to D.G.'s case for almost a year prior to the hearing. Keeling testified:

> To my recollection ... several attempts were made by the [social] workers to reunite the children back with their mother. She had some problems with her rent and was receiving public assistance, and they had assisted her in filling out her public assistance application and also applying for food stamps, and a previous worker, to my understanding, had met with her to try to make some plans to care for the children, to have them returned home.

Keeling referred to two notes in the DHS case file, both apparently written by D.G.'s mother, which indicated that the mother had no interest in caring for her children.[3] She also said that D.G. could not recall when his natural mother had last visited him. Keeling herself had visited D.G. in his foster home, which appeared to her to be a good placement.

LaTonya Reynolds was a social worker with Family and Child Services, a private, non-profit contract agency. As D.G.'s family case worker from August 1986 until July 1987, her responsibility was to work "toward reunification, primarily, if that's possible, and if not ... to get a child adopted after all efforts [have] been done." Discussing her attempts to reunite D.G. with his natural mother, Reynolds said:

> From August of '86 to approximately May of '87, all efforts to contact Ms. G. personally [were] unsuccessful. We had several telephone contacts, and we also scheduled several office visits as well as home visits. However, she would never follow through.

> \* \* \* \* \* \*

> ... [She] cancelled a couple of home visits, you know. She would always allow me to schedule a home visit, but

---

**2.** Because the mother (appellant) and the child (appellee) have the same initials, we shall refer to only the child as "D.G." throughout this opinion. We shall identify appellant simply as D.G.'s mother.

**3.** The second of the two notes was apparently written at the time the mother left her children with a security guard in the DHS office in December 1984. That note, as summarized by the witness, stated that the mother "feels she's mentally disturbed and she doesn't want any part of the children." She did not know what to do and feared that "her next move may be suicide." The note requested placement of both children with DHS.

upon confirming them, she would have other appointments or wouldn't be there. Reynolds testified that she informed D.G.'s mother of the "urgency" of the pending administrative review in September 1986 and even went to the mother's home to offer her a ride to the hearing. The mother, however, did not attend the hearing.

On one occasion in May 1987 Reynolds did meet with D.G.'s mother in her home. Reynolds went there because "we had to [go] to court and all, along with my trying to work with her." At that time they discussed D.G.'s future, and Reynolds told D.G.'s mother of the probable consequences of not planning for her children. The mother, however, did not ask for assistance to expedite reunification with her children, but she did request a referral for her own mental health problems. Transportation was provided, and she checked herself into Saint Elizabeths Hospital for approximately one week.

Reynolds said that "attempts and contacts were made pretty much anywhere from three to four times per month." She testified that D.G.'s mother said she had no reason to visit D.G. because he was well cared for in his foster home. Apart from the psychiatric referral request, the mother's only expressed need was for assistance in securing pension benefits for the man alleged to be D.G.'s father. She made no specific request to visit with her son. Reynolds tried to set up a visit during the Christmas holidays, "but there was no response from that December correspondence." On cross-examination Reynolds stated that she had initiated the exchanges with D.G.'s mother on almost every occasion, with only one exception. She also pointed out that even after the administrative hearing, she tried to contact the mother in November 1986 to find out whether she had any interest in reunification, but she received no response. Finally, Reynolds testified that she prepared, on behalf of her agency, a report for submission at the administrative review proceeding in September 1986. The report described

"family activity" and did not express a preference for either reunification or adoption. The independent reviewer, however, determined that adoption was the preferable course for D.G.'s future.

Florrie Green, D.G.'s foster mother, testified that D.G. was placed in her home for two months in 1982, until his aunt "came and got him." He was returned to Mrs. Green's home in January 1985 and remained with her from that time until the date of the hearing in July 1988. She said that she and her husband were planning to adopt him and that D.G. was "looking forward to it." [4] Green stated that two visits per month were scheduled between D.G. and his natural mother, but that the mother had visited only three times during the three and a half years since D.G. came to the Green household in January 1985, and not once in the previous year.

Daniel Craddock, a DHS social worker, was assigned to D.G.'s case for approximately four months, from September 1986 (shortly before the administrative hearing) to January 1987. Craddock testified that his role was to be "mainly responsible for the child" and that he "had no interaction with the family whatsoever," although he did have regular contacts with another social worker, LaTonya Reynolds, who was dealing with D.G.'s mother. He said that the "change of objective" (from long-term foster care to adoption) which resulted from the administrative hearing was due to two factors: the lack of visitation from D.G.'s parents (*i.e.*, his mother) and D.G.'s willingness and desire to be adopted. Craddock noted that he was not barred from urging reunification, despite the administrative recommendation. D.G.'s mother, however, gave no indication that she was prepared to care for her son.

D.G.'s attorney, relying on D.C.Code § 16–2353 (1989), argued that the child's best interest was the controlling factor in the decision to terminate parental rights. Counsel for D.G.'s mother, however, ar-

---

**4.** The record reflects, however, that some time after the hearing there was a "breakdown" in the relationship between D.G. and Mrs. Green.

On September 13, 1989, D.G. was moved to a group home to await placement in a new foster home.

gued that the controlling factor was whether DHS had done "everything possible" to reunite D.G. with his natural mother. Citing federal statutes and case law from other jurisdictions, counsel argued that the court must determine that all "reasonable efforts" for reunification had been made, and that the District had an articulated plan to reunite the child and its natural parents. The hearing was then recessed so that additional documents could be obtained.

Several days later the court reconvened the hearing, and all agency records—case plans, progress notes, transfer summaries and administrative review records—were entered into evidence and reviewed. The court then said:

> It's not at all clear to me that ... a failure to make reasonable efforts would bar a termination. I always understood that the single most important factor to take into account is the needs and the best interests of the child.

> But having said that, I am also satisfied that reasonable efforts, the requisite reasonable efforts were made by the department. A plan was established. It's clear from a reading of the file that the mother simply refused to cooperate at all with the department.

> I think the good faith of the department was shown by an earlier incident in 1982. Their goal then was to reunite, and indeed they were effective [in doing] so, but the mother's condition apparently worsened because after the most recent abandonment, if you will, the mother showed virtually no interest in the children at all.

> \* \* \* \* \* \*

> But I'm satisfied that ... as I say, reasonable efforts were made by the department; that ... they were unsuccessful due entirely to the mother's own failure to cooperate.

The court concluded that adoption was in D.G.'s best interests.

In a subsequent order formally terminating the mother's parental rights, the court found *inter alia:*

that the D.C. Department of Human Services made reasonable efforts to reunify this family and that the failure of those efforts [was] due entirely to the child's mother ... [and] that it is in the best interests of this child to be readied for adoption and that an adoption petition has been filed for this child. . . .

## II

■ "The fundamental liberty interest of natural parents in the care, custody, and management of their child does not evaporate simply because they have not been model parents or have lost temporary custody of their child to the State. Even when blood relationships are strained, parents retain a vital interest in preventing the irretrievable destruction of their family life." *Santosky v. Kramer*, 455 U.S. 745, 753, 102 S.Ct. 1388, 1394, 71 L.Ed.2d 599 (1982). In the District of Columbia, the fundamental presumption is that children and their natural parents should remain together. *Cf. Shelton v. Bradley*, 526 A.2d 579, 580 (D.C.1987) (construing D.C.Code § 21–101(a) (1989) as "creat[ing] a strong presumption that, upon the death of one parent, the surviving parent will have custody of any minor children"). Accordingly, the government does not ordinarily interfere with parent-child relationships.

■ Unfortunately, however, there are times when the family unit breaks down. When this occurs, the state has a strong interest in the protection of children and, on occasion, must come forward to assert that interest by seeking a termination of parental rights. In such situations, when circumstances dictate interference with the legal bond between child and parent, the paramount consideration is the best interests of the child. *In re A.B.E.*, 564 A.2d 751, 754 (D.C.1989); *In re U.S.W.*, 541 A.2d 625, 626 (D.C.1988). A court may terminate a parent-child relationship only when it "finds from the evidence presented, after giving due consideration to the interests of all parties, that the termination is in the best interests of the child." D.C.Code § 16–2353(a) (1989). Such a finding must

be based on clear and convincing evidence. *In re M.M.M.*, 485 A.2d 180, 183 (D.C.1984).

Statutory standards have been established in the District of Columbia to aid a court in making this determination:

> In determining whether it is in the child's best interests that the parent and child relationship be terminated, a judge shall consider each of the following factors:
>
> (1) the child's need for continuity of care and caretakers and for timely integration into a stable and permanent home, taking into account the differences in the development and the concept of time of children of different ages;
>
> (2) the physical, mental and emotional health of all individuals involved to the degree that such affects the welfare of the child, the decisive consideration being the physical, mental and emotional needs of the child;
>
> (3) the quality of the interaction and interrelationship of the child with his or her parent, siblings, relatives and/or caretakers, including the foster parent;
>
> (4) to the extent feasible, the child's opinion of his or her own best interests in the matter; and
>
> (5) evidence that drug-related activity continues to exist in a child's home environment after intervention and services have been provided pursuant to [D.C. Code § 6–2101 *et seq.*]. Evidence of continued drug activity shall be given great weight.

D.C.Code § 16–2353(b) (1990 Supp.).

D.G.'s mother takes issue with the "best interests" test, arguing instead that the primary focus should be on the extent of efforts directed towards the reunification of parent and child. In making this argument, she seeks in effect to replace the overall purpose and goal of termination of parental rights with one of the factors in the decision-making process. We decline to accept her arguments, for we see no inconsistency whatever between the best inter-ests test and the need to explore every avenue of reconciliation between child and parent. Indeed, the first of the five statutory criteria for determining the child's best interest is the "need for continuity of care and caretakers and for timely integration into a stable and permanent home." The presumption is that natural parents satisfy this need, and that the legal bond between parent and child will be disturbed only when they do not. *See, e.g., Santosky v. Kramer, supra,* 455 U.S. at 753, 102 S.Ct. at 1394. Nevertheless, "[t]he fact that the parent's interest in preserving the relationship may be great is not as significant as the fact that the parent may be unwilling or unable to fulfill the child's most basic needs." *In re M.M.M., supra,* 485 A.2d at 184; *see also In re A.B.E., supra,* 564 A.2d at 754–755 (while the rights of natural parents to bring up their children are protected by the Due Process and Equal Protection Clauses of the Constitution, these rights are not absolute, and must give way before the child's best interests).

■ In challenging the best interests test, D.G.'s mother asserts that the CWA provides relief to parents, like herself, whose parental rights have been terminated by a court. She calls attention to those provisions in the CWA which require the District of Columbia to follow federal guidelines in order to qualify for federal funding for child welfare services [5] and for foster care and adoption assistance.[6] In order to qualify for such funds under the CWA, the District must develop a plan which provides that, for each child as to whom money has been spent for foster care, reasonable efforts to avoid having to remove the child from his or her home, and to make it possible for the child to return home, were made before the child was placed in foster care. 42 U.S.C. §§ 671(a)(15), 672(a)(1) (1988). The plan must be approved by the Secretary of Health and Human Services. 42 U.S.C.

---

5. 42 U.S.C. §§ 620–628 (1988).

6. 42 U.S.C. §§ 670–676 (1988).

§ 671(a) (1988).[7] Furthermore, the District's plan must provide for the development of a case plan (as defined in section 675(1)) for each child, which must be reviewed at least every six months by a court or an administrative agency. 42 U.S.C. §§ 671(a)(16), 675(5)(B) (1988). D.G.'s mother asserts that these requirements were not met and that the termination of her parental rights was therefore unlawful. We hold, however, that D.G.'s mother lacks standing to make these claims because the CWA gives her no private right of action to enforce its provisions against the District of Columbia.[8]

In *Cort v. Ash,* 422 U.S. 66, 78, 95 S.Ct. 2080, 2088, 45 L.Ed.2d 26 (1975), the Supreme Court identified four factors which it deemed relevant to "determining whether a private remedy is implicit in a statute not expressly providing one...." The first three are pertinent here:

> First, is the plaintiff "one of the class for whose *especial* benefit the statute was enacted" ...? Second, is there any indication of legislative intent, explicit or implicit, either to create such a remedy or to deny one? ... Third, is it consistent with the underlying purposes of the legislative scheme to imply such a remedy for the plaintiff?

*Id.* (citations omitted; emphasis added in *Cort*).[9] We conclude that appellant's claim passes none of these tests. We find ourselves in agreement with the Sixth Circuit, which has held that the CWA does not confer standing to seek relief on a parent whose parental rights have been terminated. *Lesher v. Lavrich,* 784 F.2d 193 (6th Cir.1986).

The plaintiffs in *Lesher* were the natural mother and stepfather of two allegedly neglected children whose parental rights had been terminated by an Ohio court after two hearings and a finding of neglect. They brought an action to compel the state to return the children to their custody, alleging *inter alia* that Ohio officials had failed to comply with provisions of the CWA. The Sixth Circuit held, however, that they did not have standing:

> We think it obvious that whatever rights the [CWA] might confer on parents, relief nullifying a prior state court judgment of child neglect or dependency, or awarding damages in connection therewith, would not be available. An otherwise valid finding of neglect or dependency could not be rendered invalid— at least not under this statute—merely by the failure of the state to undertake an obligation to offer preventive services.

*Lesher, supra,* 784 F.2d at 197–198.

One of the claims made by the appellants in *Lesher* is identical to the one in the case at bar. They argued that Ohio's child protection law was unlawfully applied to them because the state had failed to comply with provisions of the CWA. Specifically, they claimed that Ohio's procedures lacked the "preplacement preventive service program" required by 42 U.S.C. § 627(b)(3) (1988). The Sixth Circuit noted that the

---

**7.** The CWA also prohibits any federal payment for foster care "in the case of any child who was removed from his or her home pursuant to a voluntary placement agreement ... and has remained in voluntary placement for a period in excess of 180 days unless there has been a judicial determination by a court of competent jurisdiction (within the first 180 days of such placement) to the effect that such placement is in the best interests of the child." 42 U.S.C. § 672(e). The case at bar, however, does not involve a voluntary placement as that term is defined in the CWA, 42 U.S.C. § 672(f).

**8.** We do not decide whether the District did or did not comply with the CWA in this particular case. There is, however, considerable evidence that the District did strive to reunite D.G. with his mother before the mother's parental rights were terminated. The trial court specifically found that "[t]he D.C. Department of Human Services made reasonable efforts to reunify this family and that the failure of those efforts [was] due entirely to the child's mother." Case plans and other relevant documents were introduced into evidence and reviewed by the court, although the record before us does not contain them. The record also does not reveal whether the filing deadlines mandated by the CWA were or were not met.

**9.** The fourth factor, whether the cause of action (if any) is "traditionally relegated to state law ... so that it would be inappropriate to infer a cause of action based solely on federal law," 422 U.S. at 78, 95 S.Ct. at 2088, is not applicable to this case.

appellants would have standing to assert this claim only if the CWA permitted a private cause of action. The court held that it did not:

> It may be reasonable to read the [CWA] to permit parents and children affected by the programs it funds to sue to force those programs to comply with the federal funding requirements; however, the instant action presents entirely different issues. Neither appellants' amended complaint nor either of their briefs even remotely suggest[s] that this action sought the prospective relief of requiring the State to revise its procedures and institute, in the future, "preplacement preventive service plans" for all child protection cases. Rather, the complaint sought only retrospective relief, in the form of damages for the appellees' past conduct, and an injunction unwinding the prior neglect and dependency decision.

784 F.2d at 197. The court concluded that the appellants lacked standing and affirmed the dismissal of their CWA–based claim.

The *Lesher* court distinguished a First Circuit decision on which appellant also relies. In *Lynch v. Dukakis*, 719 F.2d 504 (1st Cir.1983), the court held that a private cause of action under 42 U.S.C. § 1983 (1982), a civil rights statute, does exist against state officials for non-compliance with the case plan and review obligations imposed by the CWA. However, as the *Lesher* court pointed out, *Lynch* was a class action, brought on behalf of children in the Massachusetts foster care system,

> to force the State of Massachusetts to revise its child protection procedures to comply with the conditions for federal

funding set forth in the [CWA]. The plaintiffs did not seek damages, nor did they seek to undo prior child protective actions taken by the State—they sought only to force the State to institute the case plan and review procedures required by § 671(a)(16) and (b) of the Act.

*Lesher, supra,* 784 F.2d at 197. In *Lesher,* on the other hand, the plaintiffs were not members of an adversely affected class of children, seeking to force the state and its officials to comply with a statute enacted for their benefit. Rather—as in this case— they were parents whose children had been taken away from them after a finding of neglect, and who were invoking the CWA simply as a means of overturning that finding. We find no helpful parallels between the holding in *Lynch* and the issues now before us.[10]

Appellant also urges us to follow the holding of the Supreme Court of Delaware in *In re Burns*, 519 A.2d 638 (Del.1986). In that case the Delaware Division of Child Protective Services petitioned a local family court to terminate a natural mother's parental rights. The court granted the petition, and the mother appealed. The Supreme Court of Delaware held that the termination proceedings did not comport with due process, and that the Division of Child Protective Services had failed to comply with the requirements of the CWA and state law in preparing case plans. However, *Burns* is different from the case before us in that, as the Supreme Court of Delaware pointed out, "Delaware has its own statutory mandate ... requiring 'preplacement, preventive services and reunification services' for children and their families. The statute also requires written case

---

10. Similarly, in *L.J. ex rel. Darr v. Massinga*, 838 F.2d 118, 123 (4th Cir.1988), *cert. denied,* 488 U.S. 1018, 109 S.Ct. 816, 102 L.Ed.2d 805 (1989), and *Del A. v. Edwards*, 855 F.2d 1148 (5th Cir. 1988), foster children brought actions under 42 U.S.C. § 1983 against certain officials in their respective states for violations of the CWA. In each case the class of plaintiffs sought injunctions and money damages. The Fourth and Fifth Circuits held that the CWA gave the children causes of action, and that state officials were not entitled to qualified immunity from the suits. It is important to note, however, that

these were class actions, brought by members of the very class for whose benefit the CWA was passed. Under the test established in *Cort v. Ash, supra,* 422 U.S. at 78, 95 S.Ct. at 2088, the courts were bound to entertain the claims on their merits. In the case now before us, by contrast, appellant is not a member of the class for whose "especial benefit" the statute was enacted, nor is there any indication that the CWA was intended to furnish her with a retrospective remedy for the termination of her parental rights.

plans and semi-annual reviews of such plans." *Id.* at 647–648 (citations omitted). The *Burns* court assumed that the mother in that case had standing, but it did not hold that her standing was derived from the CWA. Indeed, the Delaware statute involved in *Burns* specifically imposes on one of the state's executive departments a duty "[t]o provide for a variety of facilities and services to children, youth *and their families . . . ." Id.* at 648 n. 11 (emphasis added). The statute then goes on to provide for reunification services and case plans. Thus it appears that the plaintiff in *Burns* was an intended beneficiary of the state statute, and that her standing to sue was derived from that statute, not from the CWA.[11] The District of Columbia does not have a similar statute, and we are not persuaded that the CWA, by itself, gives appellant standing to seek the relief she seeks in this case.

Finally, the CWA itself is very clear in prescribing what is to happen when a state (or the District of Columbia) does not comply with its provisions. The CWA provides:

> [I]n any case in which the Secretary finds, after reasonable notice and opportunity for a hearing, that a State plan which has been approved by the Secretary no longer complies with the provisions of subsection (a) of this section, or that in the administration of the plan there is a substantial failure to comply with the provisions of the plan, the Secretary shall notify the State that further payments will not be made to the State under this part, or that such payments will be made to the State but reduced by an amount which the Secretary determines appropriate, until the Secretary is satisfied that there is no longer any such failure to comply, and until he is so satisfied he shall make no further payments to the State, or shall reduce such payments by the amount specified in his notification to the State.

42 U.S.C. § 671(b) (1988). We must assume that the failure of Congress to provide for alternative means of enforcement was intentional; consequently, we hold that it is. not "consistent with the underlying purposes of the legislative scheme" to imply a private right of action for someone in appellant's present position. *Cort v. Ash, supra,* 422 U.S. at 78, 95 S.Ct. at 2088.

### III

Although we hold that D.G.'s mother does not have standing to seek reversal of the termination order based on the District of Columbia's alleged failure to comply with the CWA, we also conclude that changed circumstances require us to remand this case to the trial court for further consideration. We take this step because this new development places this case somewhere between two recently decided cases, and because it is impossible for us, as a reviewing court, to identify the factors that led to the trial court's decision.

During the termination hearing, Florrie Green testified that she intended to adopt D.G., who had been in her care for more than three years, and that he was looking forward to the adoption. The trial court found that "it is in the best interests of this child to be readied for adoption and that an adoption petition has been filed for this child." Obviously, the prospect of adoption was one factor in the assessment of whether termination of parental rights was in D.G.'s best interests. The subsequent breakdown in the relationship between D.G. and Mrs. Green, with the resulting disappearance of any immediate prospect of adoption, represents a significant change in circumstances. In light of that change, we conclude that the trial court should be given another opportunity to assess D.G.'s best interests.

Recently, in *In re A.W.,* 569 A.2d 168, 171–172 (D.C.1990), we held that the failure to identify adoptive parents for a child does not preclude termination of parental rights

---

**11.** Appellant also relies on two New York cases, *In re Jamie M.,* 63 N.Y.2d 388, 472 N.E.2d 311, 482 N.Y.S.2d 461 (1984), and *In re Sheila G.,* 61 N.Y.2d 368, 462 N.E.2d 1139, 474 N.Y.S.2d 421 (1984), for the proposition that a state has a statutory obligation to make diligent efforts to strengthen the relationship between parent and child prior to the termination of parental rights. These cases, however, were decided under local statutes, not under the CWA.

in a neglect proceeding. Thus, given the facts of this case, the trial court need not change its decision simply because D.G. no longer has identifiable adoptive parents. Nevertheless, we have also declared that "[i]n the absence of any substantial good to be achieved for this child by the termination of his relationship with his natural parents, the affirmative step of terminating the relationship is unsupported." *In re A.B.E., supra,* 564 A.2d at 757. In D.G.'s case, it is entirely possible that the sole "substantial good" to be gained from the termination of appellant's parental rights was the releasing of D.G. for adoption. The trial court, of course, could not foresee that D.G.'s prospects of adoption would change so abruptly. Nevertheless, given the unpleasant reality that D.G.'s chances of adoption are now significantly diminished, the factors determining D.G.'s best interests may well lead to a different conclusion. This recent change in circumstances, in our view, requires a remand so that the trial court may make a new determination of what is in D.G.'s best interests.

In remanding the case, we stress that our purpose is not to second-guess the trial court's decision; rather, we merely wish to give that court an opportunity to decide whether it is still in D.G.'s best interests to terminate the parental rights of his natural mother, now that there is no longer an immediate prospect of adoption. It is our hope that the remand proceedings may be completed with a minimum of distress for all concerned, most of all for D.G.

*Vacated and remanded.*

ROGERS, Chief Judge, concurring:

I write separately to restate my view that D.C.Code § 16–2353 (1989) requires that the trial judge's decision to terminate parental rights be tied to consideration of a timely adoption. *In re A.W.,* 569 A.2d 168, 175 (Rogers, C.J., dissenting) (in view of legislative purposes, "[i]t necessarily follows that a trial judge's consideration of the likelihood of the child's timely adoption is an integral part of the mandated assessment of whether a child's long term needs would most adequately be served by terminating the legal relationship with the child's natural parents").

The majority and I agree that "[o]bviously, the prospect of adoption was one factor in the assessment of whether termination of parental rights was in D.G.'s best interests." Majority opinion at 168, *supra.* Given the record in the instant case, it was undoubtedly a major factor, since the agency's reports did not urge adoption as efforts were being made to address the natural mother's problems in order to facilitate reunification with her child. The majority further states that the trial court "need not change its decision [to terminate parental rights] simply because D.G. no longer has identifiable adoptive parents." *Id.* While I also can agree with this statement as far as it goes, I remain of the opinion that the statute requires the court to consider the timeliness of an adoption in order to avoid creating a class of rootless children who never leave the foster care system. D.C. Code § 16–2353(b)(1) (judge "shall consider the child's need for continuity of care and timely integration into a stable and permanent home"). *See A.W., supra,* at 174–75 (noting that legislative history of termination statute indicated intent to minimize time children spent in foster care in view of concern that a large number of children in foster care were left "adrift in the 'system'" for years). Nothing in the record suggests such a rootless status, without natural parents or the timely prospect of adoptive parents, would be in D.G.'s best interests.