623 A.2d 116 (1993)
In re T.W.;
Appeal of A.W.
No. 92-FS-579.
District of Columbia Court of Appeals.
Argued March 18, 1993.
Decided April 6, 1993.
Kenneth H. Rosenau, Washington, DC, appointed by this court, for appellant.
Sumner J. Katz, Chevy Chase, MD, appointed by this court, for appellee.
Before FARRELL and SULLIVAN, Associate Judges, and PRYOR, Senior Judge.
FARRELL, Associate Judge:
This is an appeal from a decision of the trial court terminating a parent and child relationship pursuant to D.C.Code § 16-2359(f) (1989). "The legal touchstone in any proceeding to terminate parental rights is the best interest of the child, and that interest is controlling." In re A.B.E., 564 A.2d 751, 754 (D.C.1989); D.C.Code § 16-2353(a). This court "may reverse a trial court's determination of where the best interests of the child lie only when the judge has abused his discretion." In re D.R.M., 570 A.2d 796, 803 (D.C.1990). Before ordering termination of the parent-child relationship between appellant (the mother) and the child T.W., the trial judge made written findings of fact and conclusions of law, which we append hereto.[1] Appellant mounts no significant challenge to the trial court's findings of fact, including the fact that the mother "has no realistic expectation of being able to provide in the foreseeable future the care and security [the child] needs now," and that the child currently resides in a potential adoptive home where she "may now be provided experienced intelligent parental guidance, the love and the support of a readily available extended family[,] and the sense of security and stability that adoption would likely provide" (emphasis by the trial judge). As Judge Tignor's findings of fact pertinent to the best interests of the child are supported by a "firm factual foundation" in the record, id. at 803-04, we sustain them.
Appellant raises three points on appeal, only one of which calls for extended discussion.[2] She contends that the trial judge *117 "essentially" refused to hear testimony from the then twelve-year-old child regarding "the child's opinion of ... her own best interests in the matter," D.C.Code § 16-2353(b)(4), even though the statute provides that the judge "shall consider" this opinion as a factor in determining whether termination of the parental relationship is in the child's best interest. Section 16-2353(b). Appellant is careful to qualify her contention ("essentially") because she concedes that the judge did not bar testimony by the child altogether; quite the contrary, as we shall point out later. What is apparent from the record, though, is the judge's unwillingness to let the child be questioned by counsel or the court (in chambers) about "whether she wants to be adopted or not." The judge explained that in his view "that type of questioning could have a very detrimental [e]ffect on this child if she's put in a position where she feels that she has to choose between adoption[3] and a mother that I think there's no question that she loves and cares for a lot." Questions such as "how do you feel about adoption[,] do you want to be adopted," or "[h]ow would you feel about being permanently separated from your mother" would, the judge was convinced, leave the child with the impression "that what she has said has determined what the decision is," which was "just too much [of a burden] to place on a child." In short, the judge considered it "inappropriate" for the child to be asked questions whose effect would be to have her "mak[e] a decision between her mother and some adoptive family." Appellant argues that, in the face of her counsel's contrary request, the judge lacked any discretion to impose this limitation on questioning about the child's preference in the absence of expert psychological testimony about the harmful effect such questioning likely would have on this particular child.
We do not read the statute in the categorical fashion appellant advocates. See In re Baby Girl D.S., 600 A.2d 71, 83 (D.C.1991) ("trial court has considerable discretion in applying the statutory factors"). D.C.Code § 16-2353(b)(4) requires the judge, in deciding whether the best interests of the child demand termination, to consider "to the extent feasible, the child's opinion of his or her own best interests in the matter." The statute does not say the judge must derive this opinion even partly from questioning of the child herself when "feasible," i.e., when the child is old enough (and otherwise competent) to voice such an opinion. Indeed, common sense suggests that in many cases the most probative evidence of the child's opinion may lie in statements the child has made to others such as psychologists or in the child's past behavior, rather than in testimony given in the formal surroundings of a court proceeding. Our prior decisions contain no suggestion that the statute makes indispensable the child's direct testimony about her opinion on whether the parental bond should be severed. E.g., In re L.W., 613 A.2d 350, 359 (D.C.1992) (implicitly sustaining trial court's finding as to child's opinion of her own best interest based on child's conduct following visits with natural father and child's interview with psychologist).
On the other hand, appellant rightly calls our attention to suggestions in the judge's reasoning that, while legitimately concerned *118 with the impression the child might retain of having been forced to choose between parents, he deprecated the value of testimony by the child concerning her preference.[4] In an area where behavioral generalizations are risky even for experts, a court should not dismiss outright the value of a twelve-year-old's opinion of where her best interests lie[5] nor too quickly assume that the only outcome from directly involving the child in that inquiry will be harmful.[6] At least part of the concern a judge may have about a child's being asked to "take sides" can be alleviated by a nonadversarial inquiry in camera, without necessarily shrinking from questions about the child's preference. Particularly in a case where the child's prior conduct and statements point in more than one direction, her answers to the court about what disposition she thinks best for her may provide key information relevant to this statutory factor.
Nevertheless, we are far from concluding that the trial judge abused his discretion in handling the matter of the child's testimony, or in terminating the parental relationship. First, the judge did not bar all testimony by T.W.; rather, while unwilling to let her be asked questions such as "would you rather stay with the family you're with or would you rather be with your mother," he explained:
You can ask her, how did you like your visit with your mother; how do you feel about your mother, how do you feel about Ms. Corbett [the foster care provider]; how do you feel about the people you are with. And just have her as objectively as possible describe how she feels about these things....
Appellant's counsel did not call the child to the stand even for this purpose.[7] Second, despite some broad language in his reasoning, note 4, supra, the judge did not hold the view that testimony by a child about his or her ultimate preference should never be elicited; as he repeatedly stated, his concern was with T.W., "a child in every sense of the term," about whom he had heard evidence of "conflicts" and anxiety and who he "[p]articularly" believed could be harmed by the sense of having had to make the final choice herself. Third, the judge had ample testimony before him of the child's desire for adoption and ambivalence about reunification with her mother.[8] And *119 finally, "the child's opinion" is only one of the four factors the judge must consider in deciding whether termination is in the child's best interest. Judge Tignor made findings relevant to the other factors as well, andto the extent appellant even challenges themthe record firmly supports those findings. In re D.R.M., 570 A.2d at 803-04.
Accordingly, the order terminating the parent and child relationship is
Affirmed.

In the Matter of [T.W.] Respondent.

Superior Court of the District of Columbia

Family Division

Docket No. N-107-87

FINDINGS OF FACT, CONCLUSIONS OF LAW, AND ORDER
ROBERT S. TIGNOR, Judge.

* * * * * *

FINDINGS OF FACT
Respondent, [T.W.], was born July 7, 1980 to [A.W.]. Her biological father is unknown. By stipulation of May 5, 1987, it was agreed that on March 17, 1987, Respondent had been left without adequate supervision and Respondent was adjudicated neglected as defined by D.C.Code Section 16-2301(9)(B). Since August 18, 1987, Respondent has remained in the custody of the Department of Human Services (DHS).
From March, 1987, until late December, 1991, Respondent resided with Ms. Mildred L. Corbett, a foster parent. Though Respondent has confronted some academic difficulties in school and may have some learning disability, she is generally in good health. By all accounts, Ms. Corbett provided a healthy and happy home setting for Respondent and though Respondent expressed her desire to be adopted by Ms. Corbett, at sixty-one years of age, Ms. Corbett was not inclined to petition for adoption.
Since 1987, Respondent's contact with her mother has been infrequent and intermittent. Though the stipulation of May 5, 1987 anticipated that [A.W.] would secure stable housing, maintain "regular" visitation, pursue stable income and follow through on referrals, those objectives were not realized, due to [A.W.'s] failure to do that which was anticipated.
[A.W.] saw Respondent no more than three times during the year following the stipulation and was incarcerated in April, 1988. In May, 1988, [A.W.] accounted for her minimal contact with Respondent during the preceding year by explaining that she was "in a bad way", which the social worker understood referred to the mother's drug use. Generally, [T.W.'s] visits with her mother have been minimal overall and more frequent during periods when [A.W.] was incarcerated. Respondent has had no significant contact with siblings.
In late 1988, [A.W.] was placed at a halfway house, from which she absconded a month later. [A.W.] was incarcerated again in the spring of 1989, placed in a halfway house in the summer of 1990, and again absconded after about a month at the halfway house. While incarcerated, [A.W.] had visitation with Respondent on two occasions, one of which occurred through a transparent barrier; two additional visits occurred while [A.W.] was at a halfway house; while on escape status, [A.W.] spoke twice with Respondent via telephone but had no visits. [A.W.] was rearrested and has now been incarcerated since the spring of 1991. She hopes to be paroled in the near future.
There can be little doubt but that [A.W.] and Respondent feel love and affection toward each other, however, the infrequency and irregularity of Respondent's contacts with her mother, together with her mother's incarceration, have caused Respondent anxiety and ambivalence regarding such visits. Recently, Respondent has been disinclined to initiate or receive telephone communications with her mother. What [T.W.] wants and needs most is the sense of security that ensues from a sense of permanent *120 and stable love and care. For more than four years, Ms. Corbett provided [T.W.] with love and care but was unable to comply with [T.W.'s] request for the security that adoption would likely provide. [A.W.] loves [T.W.] but has no realistic expectation of being able to provide in the foreseeable future the care and security [T.W.] needs now.
Since December 23, 1991, Respondent has lived with a couple who has petitioned to adopt her. [T.W.] likes her new home and the testimony of Ms. Mae Best and that of the potential adoptive father, indicates that [T.W.] may now be provided experienced intelligent parental guidance, the love and the support of a readily available extended family and the sense of security and stability that adoption would likely provide.
While granting of the pending motion will undoubtedly cause [A.W.] some sadness, the Court expects that such will eventually be displaced by the knowledge that [T.W.] will likely thrive and more fully realize her potential in her new home.

CONCLUSIONS OF LAW
Considering [T.W.'s] physical, mental and emotional health, as well as her need for continuity of care within a healthy and supportive family setting and her interaction and interrelationship with her mother, other caretakers and siblings, the Court finds that termination of the parent and child relationship is in Respondent's best interest.
Accordingly, it is this 16th day of April, 1992,

ORDER
ORDERED that the parent and child relationship between Respondent and [A.W.] be hereby terminated pursuant to D.C.Code, Section 16-2353(a), (b), and it is further
ORDERED that Respondent's custody shall be vested in the Department of Human Services.
NOTES
[1] The only change we have made is to substitute initials for the names of the mother and the child.
[2] Appellant also contends that the Department of Human Services (DHS) interfered with visitation attempts by the mother and failed to give appellant the statutory ten-day advance notice of the transfer of the child's placement to the home of the prospective adoptive parents. D.C.Code § 16-2320(g). The latter omission would provide no grounds to set aside a termination order otherwise justified, see In re A.C., 597 A.2d 920, 924 (D.C.1991); moreover, the failure was at most a technical one because DHS notified appellant of the change within weeks after the placement occurred, and appellant had been notified of the referral of the case for adoption at least a year earlier.

DHS's reluctance to allow further visitation between appellant and the child surfaced only in April 1991 (four years after the neglect adjudication) when appellant was imprisoned following conviction for prison breach. The social worker's unwillingness to permit prison visits with the child stemmed from the emotional effect of previous such visits on T.W. Appellant's counsel challenged DHS's conduct in court, but the trial court (Judge Kennedy) denied relief pending the termination hearing set for a month later. When the hearing was later postponed for several months, appellant did not request reconsideration of her demand for visitation. In view of Judge Tignor's finding that appellant's contact with the child had been "infrequent and intermittent" since 1987, and the evidence of the child's prior reaction to visits with her mother in prison, any unwillingness of DHS to permit a resumption of visits starting in 1991 provides no basis for disturbing the termination order.
[3] A petition for adoption had been filed and the child had been residing in the home of the prospective adoptive parents for approximately three months at the time of the hearing.
[4] "[W]hat's the relevance of what a little girl in a courtroom today says about whether she wants to be adopted? ... [W]hatever her answer is, in my view it is likely to be of minimal evidentiary value.... [W]hatever she says could be the product of a number of factors that have nothing to do with the reliability of her response."
[5] See generally, CHILDREN'S COMPETENCE TO CONSENT (G. Melton, G. Koocher, & M. Saks ed. 1983). By way of illustration, this child showed considerable maturity when she wrote, apparently in a school assignment made part of the record: "I have a Dream to be a lawyer[.] To see a woman President[.] That the president lower the cost of homes. That mothers spend more time with their children th[a]n drugs." (Emphasis added.)
[6] See generally, L. Weithorn, Involving Children in Decisions Affecting Their Own Welfare: Guidelines for Professionals, in CHILDREN'S COMPETENCE TO CONSENT, supra note 5, at 241.
[7] Once the judge made clear his opposition to direct questions about the child's preference, the hearing proceeded to other matters, after which appellant's counsel informed the court that he had spoken with his client "and it's her expressed desire that her daughter not be put through the question and answer." Appellee contends that this decision by the mother moots any issue of restrictions on the child's testimony by the judge. Appellant responds that the judge's restrictionsresulting in "limited" utility of the child's testimonymust be assumed to have influenced the mother's desire. Although we are not convinced appellant has the better of this argument, our disposition makes it unnecessary to resolve the point.
[8] Social workers and the foster parent testified, inter alia, that T.W. never talked about her mother, and that T.W. often was upset and agitated by her mother's "broken promises." Her foster parent testified that T.W. had asked why she did not adopt her. The court heard testimony from the psychiatric social worker that T.W. was excited about a potential adoptive home and asked to meet her prospective adoptive parents, and testimony from the DHS social worker and adoptions placement officer about T.W.'s wish to be adopted. T.W. responded positively to her initial placement in foster care and had bonded well with the foster mother; she responded positively to the subsequent prospects for adoption; her visits to the pre-adoptive home went very well; and she apparently did not desireor at least did not initiatetelephone contacts with her mother. T.W. was anxious and ambivalent about her mother and had mixed feelings generally about their relationship; she longed for a secure home environment which she knew her mother could not provide.