**In re I.B.**

**In re S.B.**

**Appeal of W.B., Appellant (Two Cases).**

**Nos. 91–FS–795, 91–FS–1039.**

District of Columbia Court of Appeals.

Argued April 15, 1993.

Decided Sept. 30, 1993.

---

Johnny M. Riddick, for appellant.

Mitchell Linde for appellees, C.L. and H.L., foster parents.

C. Hope Brown, guardian ad litem, submitted on the brief for I.B. and S.B.

John Payton, Corp. Counsel, Charles L. Reischel, Deputy Corp. Counsel, and Susan S. McDonald, Asst. Corp. Counsel, filed a statement in lieu of brief for the District of Columbia.

Before TERRY, WAGNER, and KING, Associate Judges.

TERRY, Associate Judge:

· This termination of parental rights (TPR) case involves two young boys, now fourteen and eleven years old, who have lived most of their lives under the protection of the child welfare authorities. They are children of the same mother but different fathers. Appellant, their mother, appeals from an order granting a petition for termination of her parental rights which had been filed by their guardian *ad litem*. Her only claim on appeal is that the trial judge failed to make findings of fact and conclusions of law concerning the children's opinions as to their own best interest or, in the alternative, a specific finding that it was not feasible to consider their opinions, which she contends is required under D.C.Code § 16–2353(b)(4) (1992 Supp.).

Appellant's parental rights were terminated following a three-day evidentiary hearing, which ensued from the filing of a TPR petition by the children's guardian *ad litem* and was the culmination of almost eight years of governmental involvement with the welfare of I.B. and S.B. Present at the hearing were appellant,[1] the guardian *ad litem*, C.L. and H.L. (the foster parents of I.B. and S.B.),[2] and counsel for the putative fathers of both boys.[3] I.B.

---

1. Although personally served with notice of the proceeding, appellant did not appear until the second day of the hearing; however, her counsel was present from the outset. We note that some time before the hearing appellant had fired her counsel and that counsel sought, but was denied, leave to withdraw from the case. Despite this uncertain relationship between appellant and her attorney, she did not object to his representation of her at trial, nor does she raise any issue about it on appeal.

2. C.L., the foster mother, is appellant's cousin.

3. Since neither father has appealed from the judgment of the trial court, we do not address the evidence or the court's findings with respect to them.

and S.B. were not present and did not testify.[4] After the testimony was completed, the trial judge heard oral argument and granted the parties leave to file further pleadings. A few weeks later he filed a seventeen-page order containing extensive findings of fact and concluding that termination was in the best interests of the children. *See* D.C.Code § 16–2359(f) (1989). We hold that the judge's findings and conclusions were legally sufficient and accordingly affirm the TPR order.

## I

### A. *Background*

The District of Columbia Department of Human Services (DHS) first became involved with I.B. and S.B. in 1983 after two reported incidents of neglect involving appellant's care of them. In April 1984, following a third such incident stemming from appellant's failure to provide necessary medical treatment for I.B., the boys were placed temporarily in a DHS foster home until they were transferred to the care of their aunt. They stayed with their aunt until August 24, 1984, when a stipulation of neglect was entered against appellant. On the same date they were returned to appellant's care, but under the protective supervision of the court. *See* D.C.Code § 16–2320(a)(2) (1989) (authorizing court to order protective supervision); *id.* § 16–2301(19) (defining protective supervision).

In March 1985 the boys were again taken from appellant after yet another reported incident of neglect. They were temporarily placed in a foster home and then once again transferred to the care of their aunt. While the children were living with their aunt, the court entered an order imposing certain conditions on appellant's reunifica-

tion with her children, *e.g.*, receiving therapy and attending classes on parenting skills. The record shows that appellant only marginally complied with the terms of that order; nevertheless, in December 1985 the boys were again returned to her.

Appellant moved frequently during the next several months, causing I.B., who was then seven years old, to miss a substantial period of time from school.[5] As a result, an order was entered in May 1986 revoking protective supervision[6] and committing both boys to foster care. Appellant refused to surrender the children in compliance with this order; however, the children were ultimately found and taken from her by DHS in August 1986.[7] A new stipulation of neglect was entered on August 26.

Appellant's contact with the boys since that date has been restricted and monitored by the court. From 1986 to 1989 she had weekly unsupervised visits with them. Her right to unsupervised visitation was suspended temporarily in January 1988 after social workers concluded that appellant's home environment was not safe because she was hitting the children, leaving them unsupervised, and permitting them to engage in dangerous activities such as crossing busy intersections late at night. From early 1989 until the date of the hearing in March 1991, appellant visited with the children at a DHS facility approximately every other week, except for a period from April 1990 to October 1990, during which all visitation again had to be suspended because of appellant's conduct during several of those visits.

In the spring of 1989, the social worker who had been trying to assist appellant concluded that reunification of the family was not a realistic goal because of appel-

---

**4.** I.B. and S.B. were twelve and eight years old, respectively, at the time of the hearing.

**5.** The trial judge found that appellant's inability to stay in one location for more than a few months was a significant problem. A social worker testified that appellant had not lived at the same address for more than six months since she (the social worker) became involved in the case, that appellant had moved at least thirteen times during a four-year period, and

that she had failed to notify the social worker when her address changed.

**6.** *See In re A.M.*, 589 A.2d 1252, 1255–1257 (D.C. 1991) (court has power to revoke protective supervision).

**7.** The record is unclear as to who had custody of the boys after they were found in August 1986. They have been in the care of new foster parents, C.L. and H.L., since December 1988.

lant's failure to make any progress in meeting the conditions set by the court for reunification. As a result, the guardian *ad litem* initiated proceedings to terminate the parental rights of appellant and the boys' fathers.

### B. *The Testimony at the Hearing*

The guardian *ad litem* advised the court and other parties in her opening statement that, because of the ages of the children, "we will not be asking their testimony today or their opinion as to what they feel is in their best interest, [but] we will have testimony from social workers and clinical psychologists as to what is in the best interest of the children." Counsel for appellant made no objection.

Andrea Pinnow, a social worker, was qualified as an expert in the field of "family relations and assisting reunification of natural families." She provided most of the testimony about the general background of the case which we have already summarized. She also recounted her efforts over the years to help appellant become reunited with her children by obtaining a permanent residence, steady employment, and counseling. Unfortunately, none of these efforts met with much success. Ms. Pinnow said:

> She did make some effort to attend therapy, but she would attend a couple of times and then drop out of it. And then ... if I worked with her and convinced her ... that it was necessary, she might attend a few more times and then drop out of it for six months. She continued to move frequently and not be truthful about where she was living, and ... she said she was earning thousands of dollars ... by performing concerts [as a gospel singer], but it was never verified that she did or that she had an ongoing source of income.

Ms. Pinnow also testified about her relations with appellant and her observations of appellant's interactions with I.B. and

S.B. She described appellant's contacts with her and other social workers as dramatically unstable, changing unpredictably from being cooperative to being "extremely difficult" and "threatening." [8] Appellant's interactions with I.B. and S.B. were similarly erratic:

> It really depends on what her frame of mind is. Sometimes she can be very good with the children ... but then it can switch ... almost immediately, where she would get angry and become threatening.

In addition, Ms. Pinnow recounted several instances of appellant's "inappropriate behavior," such as telling the boys that their foster father wanted to sodomize them, saying that the reason they were not allowed to stay with her was that she was being penalized for refusing to have sex with a DHS staff member, and reporting to the police that the foster parents were using drugs and sexually abusing the boys. As for the children's feelings about their relationship with their mother, Ms. Pinnow testified that the children looked forward to her visits, but often found them stressful and embarrassing:

> Well, the boys really ... wanted her approval, and ... it was difficult for them to stand up to her, so they would ... try to ignore her or get away from her.... [N]ow they're starting to tell her ... no, that's not true, those things didn't happen.
>
> ... I know the boys do want to see her, but I think it's also hard on them because her behavior is so unpredictable; and, you know, they feel loyalty towards her, but then they know ... that they must tell the truth, that they can't lie.... It's just confusing for them.

Ms. Pinnow concluded that "it would be in [the boys'] best interest to be adopted by their foster parents, who are also relatives."

Beth Holland, another social worker, testified that she was assigned to work with

---

**8.** For example, Ms. Pinnow said that appellant had threatened to kill her and other staff members in the DHS office, threatened to blow up the building in which that office was located if Pinnow failed to recommend that the children be returned to her, and actually assaulted one social worker.

I.B. and S.B.'s foster parents in 1988. Her job involved visiting the children in the foster home each month and supervising appellant's visits with them at DHS. She also recounted several incidents of "inappropriate" conduct during those visits, such as assaulting DHS personnel, threatening Ms. Holland's life and calling her names, being verbally abusive, criticizing the care provided by the foster parents in front of the boys, and criticizing the children excessively about their physical appearance. Ms. Holland estimated that "about 50 percent of the time" appellant's "interactions [with the children] were inappropriate." She also testified that the behavior and educational performance of the children had improved significantly since they had been under the care of their current foster parents. S.B. is no longer classified as "socially and emotionally disturbed" but is now "mainstreamed," and I.B. has become "just about a straight A student at this point."

Marcia Gustafson, a psychologist employed by the public schools of Montgomery County, Maryland, and by a private psychological assessment service in the District of Columbia, was accepted by the court as an expert in the field of "assessment psychology." Ms. Gustafson, who was retained to assess appellant's parenting skills and psychological condition, concluded that appellant suffered from a histrionic personality disorder[9] and testified at length about the problems that can arise when a person afflicted with this disorder interacts with children. For example, Ms. Gustafson said that as a result of appellant's self-centeredness, "her interpersonal relationships tend to be very inconsistent, ungratifying, stormy. This, I think, has been seen in her history with her children, where she can heap love on them in one moment and then in another moment behave in very inappropriate ways and not care for their needs." She concluded that,

although "clearly love and affection and a bond" existed between appellant and her children, appellant had a "pattern" of personality traits that was difficult to change. In particular, she lacked the parenting skills and emotional stability which she needed to provide a stable mother-child relationship. Accordingly, Ms. Gustafson recommended that appellant "take parenting classes [and] that she become involved in psychotherapy...."

Concerning the two boys, Ms. Gustafson testified that they both had "very positive" feelings about their placement with their current foster parents. She also described at length what she characterized as their "mixed feelings" about their mother. She said that I.B. had told her that he wished he could live with his mother, but that he considered his foster parents his "family" and that they were "the greatest people [he] knew...." Ms. Gustafson's assessment of S.B. was that he was particularly uncomfortable with the turmoil in his relationship with his mother because his "coping skills" were less well developed than his older brother's.

C.L., the foster mother, is a public school teacher. At the time of the hearing she had been married eleven years and had a ten-year-old daughter. She testified that the two boys had lived with her family continuously since December 1988 and commented on the numerous positive changes in their personalities and academic performance since that time. For example, S.B. was unable to read or write when he began living with the L. family, but had mastered both skills since that time. C.L. also testified extensively about her relations with appellant over the years and told the court that she would like to adopt both boys. Finally, C.L. related what she knew about the children's feelings on the possibility of being reunited with their mother. She said that the children had expressed their love for their mother and a desire to live with

9. According to Ms. Gustafson, persons with this disorder are "extremely self-centered, extremely emotional, extremely demanding of attention for themselves, and therefore, in many ways, extremely immature." In addition, they interact erratically with other people and frequently be- have in a "flamboyant and sexually seductive" fashion. Although a person may be diagnosed with this disorder if he or she exhibits any four of its eight recognized symptoms, Ms. Gustafson testified that appellant exhibited all eight.

her if she could "change her ways," but if she could not, they would prefer to remain with the L. family.

Appellant's presentation consisted solely of her own testimony. She acknowledged that she had agreed to take certain steps in order to demonstrate to the court her fitness to resume custody of the children. Tellingly, she said that she did not understand why the children had been removed from her care. On the subject of the children's feelings about residing with their foster parents, appellant's testimony was contradictory. She said that the boys were "expressing their discomfort with where they are," but in the very next sentence she said that they were "happy" in the foster parents' home.

At the very end of the hearing, after the testimony had been completed and the parties had made their closing statements, appellant asked the court to subpoena the children and represented that both of them had said that they wanted to be at home with her. The court took no action on this request, but simply excused the parties and took the case under advisement.

### C. The Judge's Ruling

After making extensive findings of fact,[10] and reviewing the statutory criteria he was obliged to consider under D.C.Code § 16–2353(b) in ruling on the TPR petition, the trial judge said in his order:

> The Court finds, based on the evidence presented, that the proponent of the motion to terminate parental rights has met the required burden of proof, and has established by clear and convincing evidence that termination of the parental relationship is in the best interest of these children. In support of this conclusion, the Court notes that [the two boys], based on the testimony and documentary evidence presented, have a need for continuity of care and caretakers. Timely integration into the foster care family has occurred. However, in order for the integration to be complete, the parental

relationship must be terminated. The physical, mental, and emotional health of all the parties, based on the evidence presented, clearly requires termination of the parental relationship.

Accordingly, the judge granted the petition for termination of appellant's parental rights as to both I.B. and S.B.

### II

▆▆▆▆ In the District of Columbia, "[a] judge may enter an order for the termination of the parent and child relationship when the judge finds from the evidence presented, after giving due consideration to the interests of all parties, that the termination is in the best interests of the child." D.C.Code § 16–2353(a) (1989); *see In re Baby Girl D.S.*, 600 A.2d 71, 81 (D.C.1991); *In re D.G.*, 583 A.2d 160, 164–165 (D.C. 1990). Our termination statute requires the trial judge to consider several factors in deciding whether to enter such an order, one of which is, "to the extent feasible, the child's opinion of his or her own best interests in the matter[.]" D.C.Code § 16–2353(b)(4) (1992 Supp.). As a general proposition, trial judges "have considerable discretion in applying the statutory factors...." *In re Baby Girl D.S., supra,* 600 A.2d at 83. If a judge finds by clear and convincing evidence, after considering the statutory factors, that termination of parental rights is in the best interests of the child, he or she may enter a TPR order. D.C.Code § 16–2359(f) (1989); *see In re U.S.W.*, 541 A.2d 625, 627 (D.C.1988); *In re K.A.*, 484 A.2d 992, 995–996 (D.C.1984); *In re M.M.M.*, 485 A.2d 180, 183 (D.C.1984). We review that judgment only for abuse of discretion. *In re D.R.M.*, 570 A.2d 796, 803–804 (D.C.1990).

▆▆▆ The issue before us in this appeal is whether the trial judge adequately considered "the [children's] own opinion of [their] own best interests in the matter[.]" D.C.Code § 16–2353(b)(4). Appellant argues that he did not, and that his failure is

---

10. The judge specifically found that appellant's general demeanor and responses to questions during her testimony were consistent with the

assessments provided by the social workers and the psychologist.

evidenced by the absence of findings of fact and conclusions of law concerning those opinions or, in the alternative, a finding that it was not feasible to consider them. We are not persuaded that the judge failed in his statutory duty, nor do we agree that the statute requires more detailed findings than the record already contains.

First, and perhaps most importantly, the record of the three-day TPR hearing is replete with references to the children's opinions concerning their relationship with both appellant and the foster parents. For example, Ms. Pinnow testified at length as to the children's feelings about their mother and whether they wanted a continuing relationship with her, and summarized her opinion of their feelings when she said, "I know the boys do want to see her, but I think it's hard on them because her behavior is so unpredictable." Ms. Gustafson testified that both boys had "very positive" feelings about their placement with their foster parents and also described their mixed feelings about their mother. C.L., the foster mother, testified that the children had expressed their love for their mother and a desire to live with her if she could change her ways, but, barring such a change, they preferred living with the foster parents. During their arguments on appellant's motion for a directed verdict, counsel for appellant and the guardian *ad litem* both made numerous references to several items of evidence reflecting the opinions of the two boys.

Second, the trial judge did make findings about the children's opinions in his discussion of the testimony of Ms. Gustafson, the psychologist who assessed both boys. In finding No. 14 he wrote:

[Ms. Gustafson] observed that [I.B.] had developed good coping skills, but demonstrated bad feelings about having to deal with divided loyalties between ... his present caretakers and his mother. Also, Ms. Gustafson found [S.B.] to be cooperative and pleasant. However, she observed that [S.B.] was easily overwhelmed by stress and demonstrated weak coping skills. Ms. Gustafson observed that [S.B.] was confused about the role his mother plays in his life. Clearly, both children had very positive feelings about their relationship with the [foster parents]. However, both children were confused about their relationship with their mother. Ms. Gustafson stated that the children were not sure if [their mother] was on their side.

Nevertheless, the judge noted Ms. Gustafson's testimony "that the children did demonstrate affection toward their mother" and that there were "some positive aspects" in their relationship. On the other hand, the judge observed that "both children were very positive about their relationship with the [foster parents]." In finding No. 12 the judge cited testimony by Ms. Pinnow that, in her opinion, there was "some bonding" between appellant and her children, but that their visits "were many times very stressful to the children because of the mother's inappropriate behavior," and that her inappropriate behavior was a source of "great embarrassment" to the children. Thus, at best, appellant's assertion that the findings were inadequate refers more to the manner in which the children's opinions were memorialized, rather than the judge's compliance with the statutory directive that he, "to the extent feasible," consider those opinions in making his ultimate determination of their best interests.

In addition, as we recognized recently in a very similar case, "common sense suggests that in many cases the most probative evidence of the child's opinion may lie in statements the child has made to others such as psychologists or in the child's past behavior, rather than in testimony given in the formal surroundings of a court proceeding." *In re T.W.*, 623 A.2d 116, 117 (D.C.1993). Moreover, "[o]ur prior decisions contain no suggestion that the statute makes indispensable the child's direct testimony about [his or] her opinion on whether the parental bond should be severed." *Id.* (citation omitted). Thus, to the extent that appellant contends that it was

error not to hear directly from the boys,[11] case law makes clear that such testimony was not the only source from which their opinions could be ascertained.

 Finally, it bears reiterating that judges are not required to inventory all the evidence and explain how they weighed each evidentiary item in reaching their decisions. *See id.* at 118–119 (quoting less detailed findings and concluding that they were sufficient); *see also Citizens Ass'n of Georgetown v. District of Columbia Zoning Commission,* 402 A.2d 36, 42 (D.C. 1979). Sufficiency of findings is assessed in a less formalistic fashion. We examine whether the findings are detailed enough to allow a reviewing court to conclude that the decision "followed rationally" from the findings of fact, *Perkins v. District of Columbia Department of Employment Services,* 482 A.2d 401, 402 (D.C.1984), and is consistent with the requirements of the law. *Cf. In re K.J.L.,* 434 A.2d 1004, 1007 (D.C.1981) (finding no error even though judge's findings did not specify the standard of proof that he applied, and holding that no such statement was required). The findings of the trial judge in the instant case plainly meet this standard.

 We hold that the trial judge did not err in failing to take testimony from the two boys or in failing to make more detailed findings. *See In re T.W., supra.* This holding should not be construed, however, as a retreat from the view expressed obliquely in *Shelton v. Bradley,* 526 A.2d 579, 581 (D.C.1987), and more directly in *In re T.W., supra,* 623 A.2d at 118, that it is preferable for judges to hear directly from the children involved in such proceedings if it is at all feasible to do so. It is almost

always feasible when "the child is old enough (or otherwise competent) to voice ... an opinion" concerning his or her own best interests. *Id.* at 117. These two boys, twelve and eight years old at the time of the hearing, were certainly old enough, and the judge probably should have heard from them directly, either in an informal interview in chambers or in the more formal setting of the courtroom.[12] Nevertheless, we conclude, in light of the entire record, that he did not abuse his discretion in failing to do so.

The order terminating appellant's parental rights is therefore

*AFFIRMED.*

---

11. We note that appellant did not object at all when the guardian *ad litem* told the court that she would not be offering testimony from the children. Thus we deem the point waived, unless appellant can demonstrate that the judge's failure to call the children *sua sponte* to testify was plain error. *See Miller v. Avirom,* 127 U.S.App.D.C. 367, 369–370, 384 F.2d 319, 321–322 (1967); *cf. Watts v. United States,* 362 A.2d 706, 709 (D.C.1976) (en banc) (discussing plain error rule in criminal cases).

12. The choice between having a conversation with a child in chambers and putting that child on the witness stand is, of course, within the judge's sound discretion. As we suggested in *In re T.W.,* the judge can tailor the proceeding to fit the situation:

At least part of the concern a judge may have about a child's being asked to "take sides" can be alleviated by a nonadversarial inquiry *in camera,* without necessarily shrinking from questions about the child's preference.

623 A.2d at 118.